

**CERTIFIED
SAFETY
CONSULTING**
Saving Lives. Preventing Injuries

November 12, 2021

Eric Spengler
Spengler Agans Bradley, PLLC
Charlotte, NC 28204

Re:    Expert Opinion — Russell Dorvit v. East Penn Manufacturing Company, Inc.

Dear Mr. Spengler,

As requested, we are pleased to send you the attached report summarizing the professional opinion following the safety review performed by Mr. Andrew Gondzur regarding the above referenced matter. We understand the reason for the assessment was to obtain an unbiased opinion of the work site and job exposures reported to have occurred at the East Penn facility to determine if they were sufficient to justify the plaintiff's refusal to perform the assigned work task.

Based upon the observations made by Mr. Gondzur it appears there are significant workplace ergonomic hazards that could be reasonably anticipated to cause an employee to experience a work-related musculoskeletal disorder as a result of the delivery of a forklift batteries.

As you are aware Mr. Gondzur is a Board-Certified Industrial Hygienist certified by the American Board of Industrial Hygiene (ABIH).

As pointed out in the stated purpose of the report, all of the comments and observations are Mr. Gondzur's opinions, and they may not necessarily agree with other professionals.

Thank you for asking Certified Safety Consulting, LLC to perform this review.  If you have further questions, please feel free to call on us.

If you have any questions or comments regarding this letter, please feel free to contact Andrew Gondzur at any time.

Sincerely yours,

Andrew W. Gondzur, CPE, CIH, CSP
President/Owner

(BCPE-issued Certificate No. 1617; ABIH-issued Certificate No. 10353 CP; BCSP-issued Certificate No. 20305)

3921 Connecticut Street  Saint Louis, MO 63116    **T** 314-660-7238    **E** certifiedsafety@me.com    **W** www.certfiedsafetyconsulti

EXHIBIT
**A**
ALL-STATE LEGAL®

Case 1:21-cv-00229-NCT-JEP   Document 24-1   Filed 04/01/22   Page 1 of 28

The following represents my Rule 26 Report in the matter of Russ Dorvit vs. East Penn Manufacturing. It is based on review of materials submitted to me by your office (enumerated later), my involvement in cases involving workplace exposures, incidents and accidents, my education and experience as an occupational safety and health professional and a Certified Professional Ergonomist, my experience auditing workplaces for OSHA (Occupational Safety and Health Administration) compliance and my teaching of OSHA Standards courses at the Center for Environmental Education and Training—OSHA Education Center at Saint Louis University, as well as my knowledge of occupational risk, controls, regulations and compliance, and manual material handling practices and procedures. **I reserve the right to amend this report if other evidence becomes available.**

## ERGONOMICS AND THE ERGONOMICS PROCESS

Ergonomics is the study of work, fitting the job to the worker, rather than the other way around. When ergonomics is neglected, the risk for workplace-related musculoskeletal disorders increases.

Musculoskeletal disorders (MSDs) affect the muscles, nerves and tendons. Work-related MSDs or WMSDs (including those of the neck, upper extremities and low back) are one of the leading causes of lost workday injury and illness. Workers in many different industries and occupations can be exposed to risk factors at work, such as lifting heavy items, bending, reaching overhead, pushing and pulling heavy loads, working in awkward body postures and performing the same or similar tasks repetitively. Exposure to these known risk factors for MSDs increases a worker's risk of injury.

However, WMSDs can be prevented. Ergonomics — fitting the job to the person — helps lessen muscle fatigue, increases productivity and reduces the number and severity of work-related MSDs.

Implementing an ergonomic process has been shown to be effective in reducing the risk of developing MSDs in industries as diverse as construction, food processing, office jobs, healthcare, delivery and warehousing. Such a process would include the following:
• Provide Management Support - A strong commitment by management is critical to the overall success of an ergonomic process. Management should define clear goals and objectives for the ergonomics process, discuss them

3921 Connecticut Street Saint Louis, MO 63116    T 314-660-7238   E certifiedsafety@me.com    W www.certifiedsafetyconsulting.com

with their workers at safety meetings, assign responsibilities to designated staff members, and communicate clearly with the workforce.

- Involve Workers - Employers should implement a participatory ergonomic approach, where workers are directly involved in worksite assessments, solution development and implementation. Workers:
  - Identify and provide important information about hazards in their workplaces.
  - Assist in the ergonomic process by voicing their concerns and suggestions for reducing exposure to risk factors and by evaluating the changes made as a result of an ergonomic assessment.
- Provide Training - Training on the ergonomic process, as well as safe lifting techniques, stretching and ergonomic injury prevention, should occur. It ensures that workers are aware of ergonomics and its benefits, become informed about ergonomics related concerns in the workplace, and understand the importance of reporting early symptoms of MSDs.
- Identify Problems - Employees should be able to identify and assess ergonomic problems in the workplace before they result in MSDs.
- Encourage Early Reporting of MSD Symptoms - Early reporting can accelerate the job assessment and improvement process, helping to prevent or reduce the progression of symptoms, the development of serious injuries, and subsequent lost-time claims.
- Implement Solutions to Control Hazards - There are many possible solutions that can be implemented to reduce, control or eliminate workplace MSDs.
- Evaluate Progress - Established evaluation and corrective action procedures need to be in place to periodically assess the effectiveness of the ergonomic process and to ensure its continuous improvement and long-term success. As an ergonomic process is first developing, assessments should include determining whether goals set for the ergonomic process have been met and determining the success of the implemented ergonomic solutions.

Note: An ergonomic process uses the principles of an Injury and Illness Prevention Program to address MSD hazards. Such a process should be viewed as an ongoing function that is incorporated into the daily operations, rather than as an individual project.

3921 Connecticut Street  Saint Louis, MO 63116    T 314-660-7238    E certifiedsafety@me.com    W www.certfiedsafetyconsulting.com

## ASSUMPTIONS
### Plaintiff Alleges The Following:

- East Penn employed Russ Dorvit at its distribution facility located in Winston-Salem, North Carolina.
- Dorvit worked as a straight truck driver for East Penn based out of the HPSD. He made deliveries throughout North Carolina, South Carolina, and Virginia.
- In January 2019, Dorvit struggled physically to retrieve "junk" batteries from a UPS facility in a safe manner.
- The spent batteries were stored on a rack in a small tool room at the UPS facility, and the only way for Dorvit to remove the batteries was to pull them out on his hands and knees, while in a small space. The maneuver was awkward and difficult for Dorvit.
- The tight space prevented Dorvit from being able to use proper equipment, such as a hand cart, to move the batteries, and Dorvit was concerned about the risk of injury of twisting and pushing/pulling on his hands and knees.
- Dorvit first spoke to supervisor, Zach Christie, about his workplace safety concerns regarding the UPS facility, and Christie did not offer any solutions.
- On May 22, 2019, Dorvit dropped several batteries off to Atlantic Coast Toyota Lift ("ACTL"). Dorvit had serviced ACTL, without incident, since November 2015.
- ACTL stored batteries on a rack with slanted shelves, similar to how milk is shelved in grocery stores.
- East Penn had a "first in first out" ("FIFO") policy for stocking battery racks, meaning the oldest batteries were to be displayed at the front of the rack, with newer batteries at the rear of the rack.
- ACTL's rack was designed, per manufacturer's specifications, to be loaded from the rear. *FOR REFERENCE SAKE, NOTE THAT ONE MANUFACTURER OF SIMILAR SHELVING sells Rousseau Shelving with Sloped Shelves that provides gravity flow storage. With an average slope of 15 degrees, sloped shelves are designed for rear loading applications (also known as a flow rack). These units help to create a "first in, first out" (FIFO) system.]*
- ACTL's facility was disorganized, and the company's battery rack was positioned with the rear of the rack against a wall.
- ACTL stored batteries on the bottom shelf of the rack, just above floor level.
- When Dorvit first started delivering to ACTL, he would get down on his hands and knees on the floor, pull out all the old batteries, and push the newly delivered batteries to the back of the rack, and then load the old batteries back in last, against the weight of all the other batteries.
- Loading the rack in this way was a safety hazard and increased the risk of occupational injury to Dorvit, in violation of East Penn's policies.

3921 Connecticut Street  Saint Louis, MO 63116    T 314-660-7238    E certifiedsafety@me.com    W www.certifiedsafetyconsulting.com

- East Penn's policies for reducing occupational injuries maintain that "body posture is critical" and warns that "lifting and twisting to move product may get backs and knees outside the normal range of motion."
- East Penn's code of conduct further required Dorvit to "use equipment properly and as designed."
- East Penn required, "[a]s a condition of employment," that Dorvit be "responsible for performing his or her job safely and for minimizing the risk of injury to" himself and others.
- East Penn further required that Dorvit to "[a]lways promptly report unsafe conditions and acts to [his] supervisor" and "[u]se equipment properly and as designed."
- At the time of his termination, Dorvit was fifty-two (52) years old and had a history of a bad elbow and knee. Dorvit had elbow surgery in 2011 or 2012 and arthroscopic knee surgery in 2013. Dorvit disclosed his full medical condition, including his prior surgeries, in his employment application materials to East Penn.
- In recognition of the safety hazards posed by improperly loading the battery rack on his hands and knees, Dorvit asked the customer representative at ACTL, in late 2015 or early 2016, if ACTL could move the rack out a few feet for proper loading.
- The customer representative responded that he did not know why Dorvit was even stocking the rack because all other drivers left the battery deliveries on the floor for ACTL's stock person to put the batteries on the rack, and this arrangement was acceptable to ACTL.
- Christie directed Dorvit, going forward, to get on his hands and knees and load the batteries from the front of the rack, in a manner that the rack was not designed to be loaded.
- Dorvit told Christie that loading the rack in that manner was an unsafe practice and could lead to workplace injury. Dorvit said he was not paid enough money to crawl on his hands and knees to put batteries on the rack in an unsafe manner.
- Dorvit satisfied his responsibilities under East Penn's company policies, and exercised his rights to a safe workplace under North Carolina law, by reporting safety issues with the battery racks at the UPS and ACTL facilities.
- On May 31, 2019, Snyder informed Dorvit he was terminated for insubordination. East Penn terminated Dorvit's employment after he voiced complaints about workplace safety.

3921 Connecticut Street  Saint Louis, MO 63116   T 314-660-7238  E certifiedsafety@me.com  W www.certifiedsafetyconsulting.com

**Professional Opinions and Basis for these Opinions**

In my professional opinion the subject workplace, and work therein, were unsafe and unreasonably dangerous, as designed, for one or more of the following reasons:

1. OSHA routinely informs employers they must follow manufacturer's guidelines when using third party equipment and machinery. For this reason positive steps must be taken to ensure heavy or bulky items are loaded from the rear in a FIFO-designed system within a sloped shelf rack.
2. Safe ergonomic practices specify that risk factors for musculoskeletal disorders (MSDs) are forceful exertion, awkward posture, contact stress and excessive repetition, among others, and when two or more risk factors are present there is significant increase in the risk of experiencing an MSD over time.
3. Loading a rack at floor level from the front with heavy batteries significantly increases the risk of musculoskeletal disorder due to a combining of risk factors, as described below:
   3.1. Forceful exertion of pulling out older batteries weighing from 30 to 50 pounds with shoulder extension while in an extremely awkward posture kneeling on a hard surface, coupled with twisting and contact stress both from kneeling on floor and leaning or resting on hard shelf and/or hard shelf edge.
   3.2. Forceful exertions of pushing a series of two or more batteries weighing from 30 to 50 pounds, up an approximate 15 to 20 degree slope, against the force of gravity, with shoulder extension while in an extremely awkward posture kneeling on a hard surface while experiencing contact pressure or contact stress from the floor, shelf and shelf edge.
4. If I were contracted by an employer to perform a job hazard analysis on a task such as the one described herein, I, or any professional ergonomist , would highlight the task as requiring a formal, on-site ergonomics analysis and pursuant to the findings I would likely recommend an immediate redesign of the job.
5. Mr. Dorvit reports that during prior deliveries he pointed out that this type of rear-loading rack should be positioned away from the wall, as per the manufacturer, and as seen routinely at the vast majority of other customer sites. Such positioning would allow access for safe loading, not only by East Penn personnel but also by their customers' in-house personnel. Had the shelf been positioned properly the ergonomic injury risks could have been significantly reduced or eliminated and this entire incident could have been

3921 Connecticut Street  Saint Louis, MO 63116     T 314-660-7238    E certifiedsafety@me.com    W www.certfiedsafetyconsulting.com

prevented. Several weeks after Dorvit's termination ACTL relocated the rack away from the back wall allowing access to safely load from the rear, indicating ACTL likely recognized the hazard of its original position.

6. One of the requirements of proper safety management is the performance of a hazard evaluation. When a business involves a changing workplace due to, for instance, delivery work, one approach is to perform a site-specific hazard evaluation through conducting a job hazard analysis (JHA) or job safety analysis (JSA). These tools are used to pre-plan the work, identify all of the potential hazards that may be faced in the course and scope of that work, and define the controls the employer will implement to protect the employees from the hazards. There was no evidence discovered that East Penn conducted a JHA for this particular job. Such a JHA would have identified the need for training on hazard recognition, awareness of ergonomics risk factors that employees might encounter on a job site, and the need for control measures to remedy the risk factors.

3921 Connecticut Street  Saint Louis, MO 63116     T 314-660-7238     E certifiedsafety@me.com     W www.certifedsafetyconsulting.com

**Information considered in Formulating the Above Opinions**

1. 0007-DEKA-SLI-Spec-Sheet
2. 2021.03.22 [Doc. 1-2] Exhibit 2 - Driver Code of Conduct
3. 2021.03.22 [Doc. 1-3] Exhibit 3 - Workplace Safety Policy
4. 2021.03.22 [Doc. 1-4] Exhibit 4 - Company Code of Conduct
5. 2021.03.22 [Doc. 1] Complaint
6. Consulting Agreement with SAB re CIH, CPE A Gondzur
7. EPM 00065-66
8. Consultation with current and former St. Louis Area OSHA Compliance Officers M. Martin and L. Darrow, respectively
9. Consultation with Mr. Russell Dorvit
10. EPM 0000070
11. Letter to Andrew Gondzur - Dorvit v. East Penn
12. Plaintiff 000065-Plaintiff 000066
13. Photos from Plaintiff 000089-Plaintiff 000090
14. Knowledge, training and experience as a Certified Professional Ergonomist, Certified Safety Professional and Certified Industrial Hygienist including ten years experience in teaching OSHA Standards at Saint Louis University.
15. Training and experience as a loss control engineer and applying that to risk assessment.
16. Knowledge of musculoskeletal disorder hazard analysis and control policies and procedures during and subsequent to my employment at a manufacturer, distributor and warehouser, U.S. Paint Corporation.

**Attachments**

Attached and made a part of this report are my Curriculum Vitae (Exhibit A) and a list of *zero* cases I have testified, by deposition and/or during trial, in the past four years (Exhibit B). Also attached is a copy of OSHA's webpage on Ergonomics Standards and Enforcement FAQs (Exhibit C).

**Compensation**

My fee schedule is $150.00 per hour plus expenses. To review all materials to date and prepare this report, I have been compensated approximately $3000.00.

3921 Connecticut Street  Saint Louis, MO 63116    T 314-660-7238    E certifiedsafety@me.com    W www.certifiedsafetyconsulting.com

# ANDREW W. GONDZUR, CIH, CSP, CPE
### 3921 Connecticut Street Saint Louis, Missouri 63116-3905
### 314-660-7238    certifiedsafety@me.com

## WORK EXPERIENCE AND ACCOMPLISHMENTS

**PRESIDENT/OWNER.** Certified Safety Consulting, LLC, St. Louis, MO, Sept. 2008 to present

### OWN/OPERATE INDEPENDENT SAFETY AND HEALTH CONSULTING BUSINESS

- Certified Industrial Hygienist – air/soil/water sampling, noise monitoring & IAQ
- Certified Safety Professional – vast array of customized safety training services
- Certified Professional Ergonomist – industrial / office evaluations and solutions
- Independent loss control services provided to insurance carriers/brokers/agents
- Risk assessments for all industries, for private business interests and insurance
- OSHA/EPA compliance audits + authorized/certified training on all OSHA topics
- Professional Instructor at OSHA Education Center, CEET, Saint Louis University

**LOSS PREVENTION CONSULTANT.** Missouri Employers Mutual, St. Louis, MO, 1998 to 2008

### MANAGE BOOK OF BUSINESS FOR WORKERS COMPENSATION INSURANCE

- Consultant responsible for risk selection/improvement and value-added services
- Conducting risk assessment surveys, industrial hygiene, writing formal recommendations targeting root causes and management systems; developing safety resources for field staff's use; developing and implementing safety programs for policyholders; developing and delivering creative and motivational safety training programs for construction/general industry clients
- Work cooperatively with underwriting, claims, and loss prevention co-workers as well as insurance agents and policyholders to develop win-win solutions
- Assist in managing department operating and capital budgets
- Support field consultants to meet department goals and company mission, and achieve company vision of injury-free workplaces

**INDUSTRIAL HYGIENIST/EHS COORDINATOR/TRADEMARK & COPYRIGHT COMPLIANCE COORDINATOR.** U.S. Paint Corporation, St. Louis, MO, 1990 to 1998

### COORDINATED OCCUPATIONAL/ENVIRONMENTAL SAFETY & HEALTH PROGRAMS

- Ensured company and customer compliance with federal, state and local regulations (OSHA, EPA, MDNR, etc.) through work with EHS Department co-workers and in cooperation with other company associates at all levels
- Assisted in managing department operating and capital budgets, supervised and Regulatory Specialists to meet department goals / company mission

### MANAGED OSHA-COMPLIANT SAFETY PROGRAM

- Developed/maintained safety/health programs & training sessions; Chaired Safety Committee, coordinated monthly safety meetings and lead monthly inspections

### CREATED INDUSTRIAL HYGIENE PROGRAM

- Designed and implemented a comprehensive Industrial Hygiene Program, including air, soil and water sampling protocols, hazardous waste remediation
- Evaluated exposures to 25 different classes of chemicals, including organic solvents, methylene chloride, lead and chromium, isocyanates and formaldehyde, asbestos and silica; evaluated occupational noise exposures including dosimetry

- Worked with R&D, Ops, Facilities and contractors to specify and initiate control measures including substitution, isolation/enclosure, ventilation and PPE
- Revised and administered Respiratory Protection Program, including fit-testing

**TRAINED PERSONNEL**
- Created comprehensive safety training programs
- Wrote standard operating procedures and designed new training manuals
- Lead fun, effective training sessions enjoyed by over 1000 employees, contractors, customers and distributors to aggressively promote safety on <u>and</u> off the job!

**CREATED PRODUCT SUPPORT SERVICES PROGRAM**
- Developed on-site program to assist key customers with regulatory compliance, industrial hygiene surveys, safety audits and customized EHS training seminars

**MANAGED MATERIAL SAFETY DATA SHEET (MSDS) DATABASE**
- Performed hazard analyses on more than 4000 chemicals to develop product MSDS

**DEVELOPED SAFETY INCENTIVE PROGRAM**
- Implemented successful Safety Incentive Program per behavior-based safety theory

**COORDINATED WORKERS' COMPENSATION BENEFITS**
- Worked with Human Resources, union representatives, insurance carrier and medical provider to implement a series of cost-saving measures including Ergonomics and Transitional Duty program plus Post-accident drug/alcohol screens

**IMPLEMENTED PROGRAMS TO REDUCE ACCIDENT/INJURY RATES**
- Experienced 40% decrease in the number of recordable injuries

## PROFESSIONAL AND COMMUNITY INVOLVEMENT

**MEMBER, AMERICAN SOCIETY OF SAFETY PROFESSIONALS.** St. Louis, MO 1997 to present.

**MEMBER, AMERICAN INDUSTRIAL HYGIENE ASSOCIATION.** St. Louis, MO 1991 to present.

**PRESIDENT, PTO-MULLANPHY ELEMENTARY SCHOOL.** St. Louis, MO 2006-2009.

**PRESIDENT, BOARD OF DIRECTORS, GRAND OAK HILL CC.** St. Louis, MO 1999 to 2002.

## EDUCATION AND PROFESSIONAL DEVELOPMENT

**MASTER OF SCIENCE, INDUSTRIAL SAFETY MANAGEMENT, UNIVERSITY OF CENTRAL MISSOURI (FORMERLY CMSU), EXTENDED CAMPUS.** St. Louis, MO 1999.

**BACHELOR OF SCIENCE, ENVIRONMENTAL HEALTH, ILLINOIS STATE UNIVERSITY INDUSTRIAL HYGIENE TRACK, CHEMISTRY CONCENTRATION.** Normal, IL 1990

**ERGONOMICS, FLAMMABLE/COMBUSTIBLE LIQUIDS, INDOOR AIR QUALITY, RESPIRATORY PROTECTION; OSHA TRAINING INSTITUTE.** DES PLAINES, IL 1991-1993.

## PROFESSIONAL CERTIFICATIONS

**CIH:** Certified Industrial Hygienist (CIH) credential (CP 10353)

**CSP:** Certified Safety Professional (CSP) credential (CSP #20305)

**CPE:** Certified Professional Ergonomist (CPE) credential (CPE #1617)

**OSHA AUTHORIZED OUTREACH INSTRUCTOR:** General Industry/Construction, 10&30 hr

**FIRST AID/CPR/AED Authorized Instructor**, Amer. Red Cross (Instructor#104366)



EXHIBIT B

A list of cases Andrew W. Gondzur has testified, by deposition and/or during trial, in the past four years

*THERE WERE NO CASES FOR WHICH ANDREW GONDZUR HAS TESTIFIED IN THE PAST FOUR YEARS.*

11/15/2021

# Ergonomics

## Standards and Enforcement FAQs

Congress passed, and the President signed, Senate Joint Resolutio
rescinded the original ergonomics rule, and under the Congressiona
prohibits the agency from issuing a rule that is substantially the sam
one.

OSHA has developed industry specific guidelines to provide specifi
guidance for abatement to assist employees and employers in minir

### What if I am an employer in an industry for which OSHA do
industry-specific guidelines?

Even if there are no guidelines specific to your industry, as an emplc
an obligation under the General Duty Clause, Section 5(a)(1) to keep
free from recognized serious hazards, including ergonomic hazards.
ergonomic hazards under the General Duty Clause or issue ergonor
letters, where appropriate, as part of its overall enforcement progra
encourages employers to implement effective programs or other me
ergonomic hazards and associated MSDs. A great deal of informatic
available from OSHA, NIOSH, and various industry and labor organi
establish an effective ergonomics program, and OSHA urges emplo
themselves of these resources.

### Does this mean OSHA will not use the General Duty Clause
ergonomic hazards?

OSHA will use the General Duty Clause to cite employers for ergonc
Under the OSH Act's General Duty Clause, employers must keep th
free from recognized serious hazards, including ergonomic hazards.
exists whether or not there are voluntary guidelines.

## What will the OSHA enforcement program entail?

OSHA has been assessing MSD-related issues in complaints, referr
inspections. OSHA will continue to evaluate the findings of its inspe
General Duty Clause citations or hazard alert letters for ergonomics
appropriate. OSHA will do the same when responding to worker co

OSHA will conduct inspections for ergonomic hazards and issue cit
General Duty Clause and issue ergonomic hazard alert letters, wher
OSHA will conduct follow-up inspections or investigations within 12
an ergonomic hazard alert letter.

## What about construction?

Where appropriate in the construction industry, OSHA will continue
related issues through targeted inspections and response to worker

## Will OSHA notify employers who have high rates of MSDs?

Yes. As an adjunct to the Site Specific Targeting (SST), OSHA annu
employers in the OSHA Data Initiative who report high Lost Workda
rates at their establishment(s), and recommends that they seek assi
addressing these workplace hazards. If employers report high rates
some cases may be related to ergonomic issues, they will also be u
assistance to address those hazards.

## Directives and Enforcement Policies

- Inspection Guidance for Poultry Slaughtering and Poultry Proce
  Establishments. OSHA Memorandum, (October 28, 2015).
- Inspection Guidance for Inpatient Healthcare Settings. OSHA M
  25, 2015).
- Ergonomic Hazard Alert Letter Follow-up Policy. OSHA Directive
  (April 11, 2007).

## Letters of Interpretation

- Clarification on the applicability of the Hazard Communication s
- Formaldehyde exposure and ergonomic hazards in the embalmi
- OSHA's guidelines are advisory, do not create new employer obl
- Prevention of back injuries and use of back belts. (April 6, 1998).
- Requesting clarification of Slings. (May 31, 1995).
- Ability to reconcile the Occupational Safety and Health Administr
- Ergonomics in the Baking Industry. (October 16, 1991).
- OSHA has no standards for the design and implementation of vi

# UNITED STATES
# DEPARTMENT OF LABOR

Occupational Safety & Health
Administration
200 Constitution Ave NW
Washington, DC 20210
📞 800-321-6742 (OSHA)
TTY
www.OSHA.gov

**FEDERAL GOVERNMENT**

White House
Severe Storm and Flood Recovery
Assistance
Disaster Recovery Assistance
DisasterAssistance.gov
USA.gov
No Fear Act Data
U.S. Office of Special Counsel

**OCCUPATIONAL SAFETY**

Frequently Asked Questio
A - Z Index
Freedom of Information A
Read The OSHA Newslet
Subscribe to the OSHA N
OSHA Publications
Office of Inspector Gener

DVM Realty, LLC
1656 Bullock Cir.
Owings Mills, MD 21117



BARRISTERS TITLE
—— *services* ——
*A Division of Fidelity National Title*

10130 Perimeter Parkway, Suite 140
Charlotte, NC 28216
Phone: 704-799-6441 / Fax: 704-799-6583
Email:

DVM Realty, LLC
1656 Bullock Cir.
Owings Mills, MD 21117

| | |
|---|---|
| **Date:** | March 30, 2022 |
| **Loan No.:** | |
| **File No.:** | BA22008231R |
| **Buyer(s):** | DVM Realty, LLC |
| **Seller(s):** | Denise Daniels Minor aka Brenda Denise Minor |
| **Property:** | 1000 Rock Knoll Court, Unit 173 Winston Salem, NC 27107 |

---

**Attached is your Owner's Policy of Title Insurance. This Policy insures title to the real estate referred to in Schedule A of the Policy and there is no recurring premium for your coverage. Please read the Policy carefully and contact the closing attorney if you have any questions. This Policy should be kept with your deed and other valuable documents relating to this property. If a claim is made against the title to your property, please advise us immediately at the address set out in Paragraph 18 of the Conditions section of the Policy, giving us the policy number and the nature of the claim. Thank you for allowing us to provide you with this owner's coverage and please read our Privacy Policy.**

---

If you have any questions, please do not hesitate to contact us. In Charlotte call 704-799-6441.

## OWNER'S POLICY OF TITLE INSURANCE

Issued By

## FIDELITY NATIONAL TITLE INSURANCE COMPANY

**Any notice of claim and any other notice or statement in writing required to be given to the Company under this Policy must be given to the Company at the address shown in Section 18 of the Conditions.**

COVERED RISKS

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B, AND THE CONDITIONS, FIDELITY NATIONAL TITLE INSURANCE COMPANY, a Florida corporation (the "Company") insures, as of Date of Policy and, to the extent stated in Covered Risks 9 and 10, after Date of Policy, against loss or damage, not exceeding the Amount of Insurance, sustained or incurred by the Insured by reason of:

1. Title being vested other than as stated in Schedule A.
2. Any defect in or lien or encumbrance on the Title.  This Covered Risk includes but is not limited to insurance against loss from
   (a) A defect in the Title caused by
      (i) forgery, fraud, undue influence, duress, incompetency, incapacity, or impersonation;
      (ii) failure of any person or Entity to have authorized a transfer or conveyance;
      (iii) a document affecting Title not properly created, executed, witnessed, sealed, acknowledged, notarized, or delivered;
      (iv) failure to perform those acts necessary to create a document by electronic means authorized by law;
      (v) a document executed under a falsified, expired, or otherwise invalid power of attorney;
      (vi) a document not properly filed, recorded, or indexed in the Public Records including failure to perform those acts by electronic means authorized by law; or
      (vii) a defective judicial or administrative proceeding.
   (b) The lien of real estate taxes or assessments imposed on the Title by a governmental authority due or payable, but unpaid.
   (c) Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land. The term "encroachment" includes encroachments of existing improvements located on the Land onto adjoining land, and encroachments onto the Land of existing improvements located on adjoining land.
3. Unmarketable Title.
4. No right of access to and from the Land.
5. The violation or enforcement of any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
   (a) the occupancy, use, or enjoyment of the Land;
   (b) the character, dimensions, or location of any improvement erected on the Land;
   (c) the subdivision of land; or
   (d) environmental protection
   if a notice, describing any part of the Land, is recorded in the Public Records setting forth the violation or intention to enforce, but only to the extent of the violation or enforcement referred to in that notice.
6. An enforcement action based on the exercise of a governmental police power not covered by Covered Risk 5 if a notice of the enforcement action, describing any part of the Land, is recorded in the Public Records, but only to the extent of the enforcement referred to in that notice.

**Copyright American Land Title Association.  All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use.  All other uses are prohibited.  Reprinted under license from the American Land Title Association.



7. The exercise of the rights of eminent domain if a notice of the exercise, describing any part of the Land, is recorded in the Public Records.

8. Any taking by a governmental body that has occurred and is binding on the rights of a purchaser for value without Knowledge.

9. Title being vested other than as stated in Schedule A or being defective

   (a) as a result of the avoidance in whole or in part, or from a court order providing an alternative remedy, of a transfer of all or any part of the title to or any interest in the Land occurring prior to the transaction vesting Title as shown in Schedule A because that prior transfer constituted a fraudulent or preferential transfer under federal bankruptcy, state insolvency, or similar creditors' rights laws; or

   (b) because the instrument of transfer vesting Title as shown in Schedule A constitutes a preferential transfer under federal bankruptcy, state insolvency, or similar creditors' rights laws by reason of the failure of its recording in the Public Records

      (i) to be timely, or

      (ii) to impart notice of its existence to a purchaser for value or to a judgment or lien creditor.

10. Any defect in or lien or encumbrance on the Title or other matter included in Covered Risks 1 through 9 that has been created or attached or has been filed or recorded in the Public Records subsequent to Date of Policy and prior to the recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

The Company will also pay the costs, attorneys' fees, and expenses incurred in defense of any matter insured against by this Policy, but only to the extent provided in the Conditions.

This Policy shall not be valid or binding until countersigned by a validating officer or authorized signatory.

IN WITNESS WHEREOF, FIDELITY NATIONAL TITLE INSURANCE COMPANY has caused this policy to be signed and sealed by its duly authorized officers.

**Fidelity National Title Insurance Company**

By:

Michael J. Nolan, President

Countersigned By:

Cinthya Gonzalez
Authorized Officer or Agent

Attest:

Marjorie Nemzura, Secretary

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

ALTA Owner's Policy (06-17-06)
101046D0106.doc / Updated: 01.28.22                    Page 2                    Printed: 03-30-22 @ 04:16 PM
                                                                                  NC-FT-FNCR-01040.365427-BA22008231R

Case 1:21-cv-00229-NCT-JEP   Document 24-1   Filed 04/01/22   Page 18 of 28

## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1.  (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

    (i) the occupancy, use, or enjoyment of the Land;

    (ii) the character, dimensions, or location of any improvement erected on the Land;

    (iii) the subdivision of land; or

    (iv) environmental protection;

    or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.

    (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.

2.  Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3.  Defects, liens, encumbrances, adverse claims, or other matters

    (a) created, suffered, assumed, or agreed to by the Insured Claimant;

    (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;

    (c) resulting in no loss or damage to the Insured Claimant;

    (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 and 10); or

    (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.

4.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is

    (a) a fraudulent conveyance or fraudulent transfer; or

    (b) a preferential transfer for any reason not stated in Covered Risk 9 of this policy.

5.  Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

## END OF EXCLUSIONS FROM COVERAGE

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



## SCHEDULE A

| Date of Policy | Amount of Insurance |
|---|---|
| March 24, 2022 at 11:12 AM | $55,000.00 |

Name and Address of Title Insurance Company:    Barristers Title Services, a Division of Fidelity National Title Company, LLC
10130 Perimeter Parkway, Suite 140
Charlotte, NC 28216
Phone:  704-799-6441
Fax:  704-799-6583

Address Reference:   1000 Rock Knoll Court, Unit 173, Winston Salem, NC 27107

1.  Name of Insured:

     DVM Realty, LLC

2.  The estate or interest in the Land that is insured by this Policy is:

     Fee Simple

3.  Title is vested in:

     DVM Realty, LLC, a North Carolina limited liability company

4.  The Land referred to in this Policy is described as follows:

     Lying and being situate in Forsyth County, North Carolina, and being more particularly described as follows:

     BEING KNOWN AND DESIGNATED as Unit No. 173 as shown on a plat or plats entitled "SOUTH WIND VILLAS" Phase II - Section One recorded in Unit Ownership Book No. 2, Pages 113 and 114, in the Office of the Register of Deeds of Forsyth County, North Carolina, reference to which is hereby made for a more particular description.

5.  This Policy incorporates those ALTA endorsements attached hereto.

     NONE

**END OF SCHEDULE A**

**Copyright American Land Title Association.  All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use.  All other uses are prohibited.  Reprinted under license from the American Land Title Association.

ALTA Owner's Policy (06-17-06)
101046D0106.doc / Updated: 01.28.22    Page 4    Printed: 03-30-22 @ 04:16 PM
NC-FT-FNCR-01040.365427-BA22008231R

Case 1:21-cv-00229-NCT-JEP   Document 24-1   Filed 04/01/22   Page 20 of 28

Policy Number:  BA22008231R-OP

**SCHEDULE B**
**EXCEPTIONS FROM COVERAGE**

This policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees or expenses that arise by reason of:

1.      The lien of all taxes for the year 2022 and thereafter, which are not yet due and payable.

2.      Declaration of covenants, conditions, restrictions, easements, charges, assessments, liens, options, rights of or to purchase, and rights of first refusal (but omitting any covenants or restrictions, if any, based upon race, color, religion, sex, sexual orientation, familial status, marital status, disability, handicap, national origin, ancestry, or source of income, as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted by applicable law) recorded in Book 1343, Page 952; Book 1343, Page 989 and any amendments and/or supplements thereto.

3.      Building restriction lines, easements, and any other matters shown on map or plat recorded in Condo Plat Book 2, Page 113-114.

4.      Rights of others in and to the common areas.

5.      Easement(s) and right(s)-of-way for roads or public/private utilities.

6.      Rights or claims of parties in possession as tenants under unrecorded leases.

7.      Any discrepancy, conflict, matter affecting access, shortage in area or boundary lines, encroachment, encumbrance, violation, variation, overlap, setback, easement or claims of easement, riparian right, and title to land within roads, ways, railroads, watercourses, burial grounds, marshes, dredged or filled areas or land below the mean high-water mark or within the bounds of any adjoining body of water, or other adverse circumstance affecting the Title that would be disclosed by a current inspection and accurate and complete land survey of the Land.

**END OF SCHEDULE B**

**Copyright American Land Title Association.  All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use.  All other uses are prohibited.  Reprinted under license from the American Land Title Association.



**CONDITIONS**

1. **DEFINITION OF TERMS**

   The following terms when used in this policy mean:

   (a) "Amount of Insurance": The amount stated in Schedule A, as may be increased or decreased by endorsement to this policy, increased by Section 8(b), or decreased by Sections 10 and 11 of these Conditions.

   (b) "Date of Policy": The date designated as "Date of Policy" in Schedule A.

   (c) "Entity": A corporation, partnership, trust, limited liability company, or other similar legal entity.

   (d) "Insured": The Insured named in Schedule A.

   (i) the term "Insured" also includes

   (A) successors to the Title of the Insured by operation of law as distinguished from purchase, including heirs, devisees, survivors, personal representatives, or next of kin;

   (B) successors to an Insured by dissolution, merger, consolidation, distribution, or reorganization;

   (C) successors to an Insured by its conversion to another kind of Entity;

   (D) a grantee of an Insured under a deed delivered without payment of actual valuable consideration conveying the Title

   (1) if the stock, shares, memberships, or other equity interests of the grantee are wholly-owned by the named Insured,

   (2) if the grantee wholly owns the named Insured,

   (3) if the grantee is wholly-owned by an affiliated Entity of the named Insured, provided the affiliated Entity and the named Insured are both wholly-owned by the same person or Entity, or

   (4) if the grantee is a trustee or beneficiary of a trust created by a written instrument established by the Insured named in Schedule A for estate planning purposes.

   (ii) with regard to (A),(B),(C), and (D) reserving, however, all rights and defenses as to any successor that the Company would have had against any predecessor Insured.

   (e) "Insured Claimant": An Insured claiming loss or damage.

   (f) "Knowledge" or "Known": Actual knowledge, not constructive knowledge or notice that may be imputed to an Insured by reason of the Public Records or any other records that impart constructive notice of matters affecting the Title.

   (g) "Land": The land described in Schedule A, and affixed improvements that by law constitute real property. The term "Land" does not include any property beyond the lines of the area described in Schedule A, nor any right, title, interest, estate, or easement in abutting streets, roads, avenues, alleys, lanes, ways, or waterways, but this does not modify or limit the extent that a right of access to and from the Land is insured by this policy.

   (h) "Mortgage": Mortgage, deed of trust, trust deed, or other security instrument, including one evidenced by electronic means authorized by law.

   (i) "Public Records": Records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without Knowledge. With respect to Covered Risk 5(d), "Public Records" shall also include environmental protection liens filed in the records of the clerk of the United States District Court for the district where the Land is located.

   (j) "Title": The estate or interest described in Schedule A.

   (k) "Unmarketable Title": Title affected by an alleged or apparent matter that would permit a prospective purchaser or lessee of the Title or lender on the Title to be released from the obligation to purchase, lease, or lend if there is a contractual condition requiring the delivery of marketable title.

2. **CONTINUATION OF INSURANCE**

   The coverage of this policy shall continue in force as of Date of Policy in favor of an Insured, but only so long as the Insured retains an estate or interest in the Land, or holds an obligation secured by a purchase money Mortgage given by a purchaser from the Insured, or only so long as the Insured shall have liability by reason of warranties in any transfer or conveyance of the Title. This policy shall not continue in force in favor of any purchaser from the Insured of either (i) an estate or interest in the Land, or (ii) an obligation secured by a purchase money Mortgage given to the Insured.

3. **NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT**

   The Insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 5(a) of these Conditions, (ii) in case Knowledge shall come to an Insured hereunder of any claim of title or interest that is adverse to the Title, as insured, and that might cause loss or damage for which the Company may be liable by virtue of this policy, or (iii) if the Title, as insured, is rejected as Unmarketable Title. If the Company is prejudiced by the failure of the Insured Claimant to provide prompt notice, the Company's liability to the Insured Claimant under the policy shall be reduced to the extent of the prejudice.

4. **PROOF OF LOSS**

   In the event the Company is unable to determine the amount of loss or damage, the Company may, at its option, require as a condition of payment that the Insured Claimant furnish a signed proof of loss. The proof of loss must describe the defect, lien, encumbrance, or other matter insured against by this policy that constitutes the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage.

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

Case 1:21-cv-00229-NCT-JEP   Document 24-1   Filed 04/01/22   Page 22 of 28

**5.  DEFENSE AND PROSECUTION OF ACTIONS**

(a)  Upon written request by the Insured, and subject to the options contained in Section 7 of these Conditions, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an Insured in litigation in which any third party asserts a claim covered by this policy adverse to the Insured.  This obligation is limited to only those stated causes of action alleging matters insured against by this policy.  The Company shall have the right to select counsel of its choice (subject to the right of the Insured to object for reasonable cause) to represent the Insured as to those stated causes of action.  It shall not be liable for and will not pay the fees of any other counsel.  The Company will not pay any fees, costs, or expenses incurred by the Insured in the defense of those causes of action that allege matters not insured against by this policy.

(b)  The Company shall have the right, in addition to the options contained in Section 7 of these Conditions, at its own cost, to institute and prosecute any action or proceeding or to do any other act that in its opinion may be necessary or desirable to establish the Title, as insured, or to prevent or reduce loss or damage to the Insured.  The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable to the Insured.  The exercise of these rights shall not be an admission of liability or waiver of any provision of this policy.  If the Company exercises its rights under this subsection, it must do so diligently.

(c)  Whenever the Company brings an action or asserts a defense as required or permitted by this policy, the Company may pursue the litigation to a final determination by a court of competent jurisdiction, and it expressly reserves the right, in its sole discretion, to appeal any adverse judgment or order.

**6.  DUTY OF INSURED CLAIMANT TO COOPERATE**

(a)  In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding and any appeals, the Insured shall secure to the Company the right to so prosecute or provide defense in the action or proceeding, including the right to use, at its option, the name of the Insured for this purpose.  Whenever requested by the Company, the Insured, at the Company's expense, shall give the Company all reasonable aid (i) in securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or effecting settlement, and (ii) in any other lawful act that in the opinion of the Company may be necessary or desirable to establish the Title or any other matter as insured.  If the Company is prejudiced by the failure of the Insured to furnish the required cooperation, the Company's obligations to the Insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such cooperation.

(b)  The Company may reasonably require the Insured Claimant to submit to examination under oath by any authorized representative of the Company and to produce for examination, inspection, and copying, at such reasonable times and places as may be designated by the authorized representative of the Company, all records, in whatever medium maintained, including books, ledgers, checks, memoranda, correspondence, reports, e-mails, disks, tapes, and videos whether bearing a date before or after Date of Policy, that reasonably pertain to the loss or damage.  Further, if requested by any authorized representative of the Company, the Insured Claimant shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect, and copy all of these records in the custody or control of a third party that reasonably pertain to the loss or damage.  All information designated as confidential by the Insured Claimant provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim.  Failure of the Insured Claimant to submit for examination under oath, produce any reasonably requested information, or grant permission to secure reasonably necessary information from third parties as required in this subsection, unless prohibited by law or governmental regulation, shall terminate any liability of the Company under this policy as to that claim.

**7.  OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY**

In case of a claim under this policy, the Company shall have the following additional options:

(a)  To Pay or Tender Payment of the Amount of Insurance.

To pay or tender payment of the Amount of Insurance under this policy together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment or tender of payment and that the Company is obligated to pay.

Upon the exercise by the Company of this option, all liability and obligations of the Company to the Insured under this policy, other than to make the payment required in this subsection, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

(b)  To Pay or Otherwise Settle With Parties Other Than the Insured or With the Insured Claimant.

(i)  to pay or otherwise settle with other parties for or in the name of an Insured Claimant any claim insured against under this policy.  In addition, the Company will pay any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment and that the Company is obligated to pay; or

(ii)  to pay or otherwise settle with the Insured Claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment and that the Company is obligated to pay.

Upon the exercise by the Company of either of the options provided for in subsections (b)(i) or (ii), the Company's obligations to the Insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

**Copyright American Land Title Association.  All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use.  All other uses are prohibited.  Reprinted under license from the American Land Title Association.



Case 1:21-cv-00229-NCT-JEP   Document 24-1   Filed 04/01/22   Page 23 of 28

**8. DETERMINATION AND EXTENT OF LIABILITY**

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured Claimant who has suffered loss or damage by reason of matters insured against by this policy.

(a) The extent of liability of the Company for loss or damage under this policy shall not exceed the lesser of

    (i) the Amount of Insurance; or

    (ii) the difference between the value of the Title as insured and the value of the Title subject to the risk insured against by this policy.

(b) If the Company pursues its rights under Section 5 of these Conditions and is unsuccessful in establishing the Title, as insured,

    (i) the Amount of Insurance shall be increased by Ten percent (10%), and

    (ii) the Insured Claimant shall have the right to have the loss or damage determined either as of the date the claim was made by the Insured Claimant or as of the date it is settled and paid.

(c) In addition to the extent of liability under (a) and (b), the Company will also pay those costs, attorneys' fees, and expenses incurred in accordance with Sections 5 and 7 of these Conditions.

**9. LIMITATION OF LIABILITY**

(a) If the Company establishes the Title, or removes the alleged defect, lien, or encumbrance, or cures the lack of a right of access to or from the Land, or cures the claim of Unmarketable Title, all as insured, in a reasonably diligent manner by any method, including litigation and the completion of any appeals, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused to the Insured.

(b) In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals, adverse to the Title, as insured.

(c) The Company shall not be liable for loss or damage to the Insured for liability voluntarily assumed by the Insured in settling any claim or suit without the prior written consent of the Company.

**10. REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY**

All payments under this policy, except payments made for costs, attorneys' fees, and expenses, shall reduce the Amount of Insurance by the amount of the payment.

**11. LIABILITY NONCUMULATIVE**

The Amount of Insurance shall be reduced by any amount the Company pays under any policy insuring a Mortgage to which exception is taken in Schedule B or to which the Insured has agreed, assumed, or taken subject, or which is executed by an Insured after Date of Policy and which is a charge or lien on the Title, and the amount so paid shall be deemed a payment to the Insured under this policy.

**12. PAYMENT OF LOSS**

When liability and the extent of loss or damage have been definitely fixed in accordance with these Conditions, the payment shall be made within thirty (30) days.

**13. RIGHTS OF RECOVERY UPON PAYMENT OR SETTLEMENT**

(a) Whenever the Company shall have settled and paid a claim under this policy, it shall be subrogated and entitled to the rights of the Insured Claimant in the Title and all other rights and remedies in respect to the claim that the Insured Claimant has against any person or property, to the extent of the amount of any loss, costs, attorneys' fees, and expenses paid by the Company. If requested by the Company, the Insured Claimant shall execute documents to evidence the transfer to the Company of these rights and remedies. The Insured Claimant shall permit the Company to sue, compromise, or settle in the name of the Insured Claimant and to use the name of the Insured Claimant in any transaction or litigation involving these rights and remedies.

If a payment on account of a claim does not fully cover the loss of the Insured Claimant, the Company shall defer the exercise of its right to recover until after the Insured Claimant shall have recovered its loss.

(b) The Company's right of subrogation includes the rights of the Insured to indemnities, guaranties, other policies of insurance, or bonds, notwithstanding any terms or conditions contained in those instruments that address subrogation rights.

**14. ARBITRATION**

Either the Company or the Insured may demand that the claim or controversy shall be submitted to arbitration pursuant to the Title Insurance Arbitration Rules of the American Land Title Association ("Rules"). Except as provided in the Rules, there shall be no joinder or consolidation with claims or controversies of other persons. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the Insured arising out of or relating to this policy, any service in connection with its issuance or the breach of a policy provision, or to any other controversy or claim arising out of the transaction giving rise to this policy. All arbitrable matters when the Amount of Insurance is $2,000,000 or less shall be arbitrated at the option of either the Company or the Insured. All arbitrable matters when the Amount of Insurance is in excess of $2,000,000 shall be arbitrated only when agreed to by both the Company and the Insured. Arbitration pursuant to this policy and under the Rules shall be binding upon the parties. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court of competent jurisdiction.

**15. LIABILITY LIMITED TO THIS POLICY; POLICY ENTIRE CONTRACT**

(a) This policy together with all endorsements, if any, attached to it by the Company is the entire policy and contract between the Insured and the Company. In interpreting any provision of this policy, this policy shall be construed as a whole.

(b) Any claim of loss or damage that arises out of the status of the Title or by any action asserting such claim shall be restricted to this policy.

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

(c) Any amendment of or endorsement to this policy must be in writing and authenticated by an authorized person, or expressly incorporated by Schedule A of this policy.

(d) Each endorsement to this policy issued at any time is made a part of this policy and is subject to all of its terms and provisions. Except as the endorsement expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsement, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance.

## 16. SEVERABILITY

In the event any provision of this policy, in whole or in part, is held invalid or unenforceable under applicable law, the policy shall be deemed not to include that provision or such part held to be invalid, but all other provisions shall remain in full force and effect.

## 17. CHOICE OF LAW; FORUM

(a) Choice of Law: The Insured acknowledges the Company has underwritten the risks covered by this policy and determined the premium charged therefor in reliance upon the law affecting interests in real property and applicable to the interpretation, rights, remedies, or enforcement of policies of title insurance of the jurisdiction where the Land is located.

Therefore, the court or an arbitrator shall apply the law of the jurisdiction where the Land is located to determine the validity of claims against the Title that are adverse to the Insured and to interpret and enforce the terms of this policy. In neither case shall the court or arbitrator apply its conflicts of law principles to determine the applicable law.

(b) Choice of Forum: Any litigation or other proceeding brought by the Insured against the Company must be filed only in a state or federal court within the United States of America or its territories having appropriate jurisdiction.

## 18. NOTICES, WHERE SENT

Any notice of claim and any other notice or statement in writing required to be given to the Company under this policy must be given to the Company at:

　　Fidelity National Title Insurance Company
　　P.O. Box 45023
　　Jacksonville, FL 32232-5023
　　Attn: Claims Department

**END OF CONDITIONS**

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



ALTA Owner's Policy (06-17-06)　　　　　　　　　　　　　　　　　　　　　　　Printed: 03-30-22 @ 04:16 PM
101046D0106.doc / Updated: 01.28.22　　　　　　　　　Page 9　　　　　　　NC-FT-FNCR-01040.365427-BA22008231R

Case 1:21-cv-00229-NCT-JEP   Document 24-1   Filed 04/01/22   Page 25 of 28

**FIDELITY NATIONAL FINANCIAL**
**PRIVACY NOTICE**

Effective January 1, 2021

Fidelity National Financial, Inc. and its majority-owned subsidiary companies (collectively, "FNF," "our," or "we") respect and are committed to protecting your privacy. This Privacy Notice explains how we collect, use, and protect personal information, when and to whom we disclose such information, and the choices you have about the use and disclosure of that information.

A limited number of FNF subsidiaries have their own privacy notices. If a subsidiary has its own privacy notice, the privacy notice will be available on the subsidiary's website and this Privacy Notice does not apply.

## Collection of Personal Information

FNF may collect the following categories of Personal Information:

- contact information (*e.g.*, name, address, phone number, email address);
- demographic information (*e.g.*, date of birth, gender, marital status);
- identity information (*e.g.* Social Security Number, driver's license, passport, or other government ID number);
- financial account information (*e.g.* loan or bank account information); and
- other personal information necessary to provide products or services to you.

We may collect Personal Information about you from:

- information we receive from you or your agent;
- information about your transactions with FNF, our affiliates, or others; and
- information we receive from consumer reporting agencies and/or governmental entities, either directly from these entities or through others.

## Collection of Browsing Information

FNF automatically collects the following types of Browsing Information when you access an FNF website, online service, or application (each an "FNF Website") from your Internet browser, computer, and/or device:

- Internet Protocol (IP) address and operating system;
- browser version, language, and type;
- domain name system requests; and
- browsing history on the FNF Website, such as date and time of your visit to the FNF Website and visits to the pages within the FNF Website.

Like most websites, our servers automatically log each visitor to the FNF Website and may collect the Browsing Information described above. We use Browsing Information for system administration, troubleshooting, fraud investigation, and to improve our websites. Browsing Information generally does not reveal anything personal about you, though if you have created a user account for an FNF Website and are logged into that account, the FNF Website may be able to link certain browsing activity to your user account.

## Other Online Specifics

<u>Cookies</u>. When you visit an FNF Website, a "cookie" may be sent to your computer. A cookie is a small piece of data that is sent to your Internet browser from a web server and stored on your computer's hard drive. Information gathered using cookies helps us improve your user experience. For example, a cookie can help the website load properly or can customize the display page based on your browser type and user preferences. You can choose whether or not to accept cookies by changing your Internet browser settings. Be aware that doing so may impair or limit some functionality of the FNF Website.

<u>Web Beacons</u>. We use web beacons to determine when and how many times a page has been viewed. This information is used to improve our websites.

<u>Do Not Track</u>. Currently our FNF Websites do not respond to "Do Not Track" features enabled through your browser.

Case 1:21-cv-00229-NCT-JEP   Document 24-1   Filed 04/01/22   Page 26 of 28

<u>Links to Other Sites</u>.  FNF Websites may contain links to unaffiliated third-party websites.  FNF is not responsible for the privacy practices or content of those websites.  We recommend that you read the privacy policy of every website you visit.

## Use of Personal Information

FNF uses Personal Information for three main purposes:

- To provide products and services to you or in connection with a transaction involving you.
- To improve our products and services.
- To communicate with you about our, our affiliates', and others' products and services, jointly or independently.

## When Information Is Disclosed

We may disclose your Personal Information and Browsing Information in the following circumstances:

- to enable us to detect or prevent criminal activity, fraud, material misrepresentation, or nondisclosure;
- to nonaffiliated service providers who provide or perform services or functions on our behalf and who agree to use the information only to provide such services or functions;
- to nonaffiliated third party service providers with whom we perform joint marketing, pursuant to an agreement with them to jointly market financial products or services to you;
- to law enforcement or authorities in connection with an investigation, or in response to a subpoena or court order; or
- in the good-faith belief that such disclosure is necessary to comply with legal process or applicable laws, or to protect the rights, property, or safety of FNF, its customers, or the public.

The law does not require your prior authorization and does not allow you to restrict the disclosures described above.  Additionally, we may disclose your information to third parties for whom you have given us authorization or consent to make such disclosure.  We do not otherwise share your Personal Information or Browsing Information with nonaffiliated third parties, except as required or permitted by law.  We may share your Personal Information with affiliates (other companies owned by FNF) to directly market to you.  Please see "Choices with Your Information" to learn how to restrict that sharing.

We reserve the right to transfer your Personal Information, Browsing Information, and any other information, in connection with the sale or other disposition of all or part of the FNF business and/or assets, or in the event of bankruptcy, reorganization, insolvency, receivership, or an assignment for the benefit of creditors.  By submitting Personal Information and/or Browsing Information to FNF, you expressly agree and consent to the use and/or transfer of the foregoing information in connection with any of the above described proceedings.

## Security of Your Information

We maintain physical, electronic, and procedural safeguards to protect your Personal Information.

## Choices With Your Information

If you do not want FNF to share your information among our affiliates to directly market to you, you may send an "opt out" request as directed at the end of this Privacy Notice.  We do not share your Personal Information with nonaffiliates for their use to direct market to you without your consent.

Whether you submit Personal Information or Browsing Information to FNF is entirely up to you.  If you decide not to submit Personal Information or Browsing Information, FNF may not be able to provide certain services or products to you.

<u>For California Residents</u>:  We will not share your Personal Information or Browsing Information with nonaffiliated third parties, except as permitted by California law.  For additional information about your California privacy rights, please visit the "California Privacy" link on our website (https://fnf.com/pages/californiaprivacy.aspx) or call (888) 413-1748.

For Nevada Residents:  You may be placed on our internal Do Not Call List by calling (888) 934-3354 or by contacting us via the information set forth at the end of this Privacy Notice.  Nevada law requires that we also provide you with the following contact information:  Bureau of Consumer Protection, Office of the Nevada Attorney General, 555 E. Washington St., Suite 3900, Las Vegas, NV 89101; Phone number:  (702) 486-3132; email:  BCPINFO@ag.state.nv.us.

For Oregon Residents:  We will not share your Personal Information or Browsing Information with nonaffiliated third parties for marketing purposes, except after you have been informed by us of such sharing and had an opportunity to indicate that you do not want a disclosure made for marketing purposes.

For Vermont Residents:  We will not disclose information about your creditworthiness to our affiliates and will not disclose your personal information, financial information, credit report, or health information to nonaffiliated third parties to market to you, other than as permitted by Vermont law, unless you authorize us to make those disclosures.

## Information From Children

The FNF Websites are not intended or designed to attract persons under the age of eighteen (18).  We do not collect Personal Information from any person that we know to be under the age of thirteen (13) without permission from a parent or guardian.

## International Users

FNF's headquarters is located within the United States.  If you reside outside the United States and choose to provide Personal Information or Browsing Information to us, please note that we may transfer that information outside of your country of residence.  By providing FNF with your Personal Information and/or Browsing Information, you consent to our collection, transfer, and use of such information in accordance with this Privacy Notice.

## FNF Website Services for Mortgage Loans

Certain FNF companies provide services to mortgage loan servicers, including hosting websites that collect customer information on behalf of mortgage loan servicers (the "Service Websites").  The Service Websites may contain links to both this Privacy Notice and the mortgage loan servicer or lender's privacy notice.  The sections of this Privacy Notice titled When Information is Disclosed, Choices with Your Information, and Accessing and Correcting Information do not apply to the Service Websites.  The mortgage loan servicer or lender's privacy notice governs use, disclosure, and access to your Personal Information.  FNF does not share Personal Information collected through the Service Websites, except as required or authorized by contract with the mortgage loan servicer or lender, or as required by law or in the good-faith belief that such disclosure is necessary:  to comply with a legal process or applicable law, to enforce this Privacy Notice, or to protect the rights, property, or safety of FNF or the public.

## Your Consent To This Privacy Notice; Notice Changes; Use of Comments or Feedback

By submitting Personal Information and/or Browsing Information to FNF, you consent to the collection and use of the information in accordance with this Privacy Notice.  We may change this Privacy Notice at any time.  The Privacy Notice's effective date will show the last date changes were made.  If you provide information to us following any change of the Privacy Notice, that signifies your assent to and acceptance of the changes to the Privacy Notice.

## Accessing and Correcting Information; Contact Us

If you have questions, would like to correct your Personal Information, or want to opt-out of information sharing for affiliate marketing, visit FNF's Opt Out Page or contact us by phone at (888) 934-3354 or by mail to:

Fidelity National Financial, Inc.
601 Riverside Avenue,
Jacksonville, Florida 32204
Attn:  Chief Privacy Officer