# Karen Dailey

| | |
|---|---|
| **From:** | Josh Van Kampen <josh@vankampenlaw.com> |
| **Sent:** | Tuesday, March 1, 2022 12:48 PM |
| **To:** | Christopher C. Finan |
| **Cc:** | Melchionni, Gary D.; Karen Dailey; Eric Spengler |
| **Subject:** | Re: East penn |
| **Attachments:** | DRAFT_SAB Eric Spengler_Rule 26 Report in the matter of Russ Dorvit vs. East Penn Manufacturing[9].pdf |

Chris,

Here you go.

Be well,

Josh Van Kampen | Attorney at Law



315 East Worthington Avenue
Charlotte, North Carolina 28203
Direct Dial: (704) 919-0528
Fax: (704) 749-2638
josh@vankampenlaw.com
https://link.edgepilot.com/s/0e00aed3/EY8CSskV0UGjuIsbna_ylw?u=http://www.vankampenlaw.com/

  



**From:** Christopher C. Finan <cfinan@rhrlaw.com>
**Date:** Tuesday, March 1, 2022 at 12:43 PM

1



**To:** Josh Van Kampen <josh@vankampenlaw.com>
**Cc:** Melchionni, Gary D. <gary.melchionni@stevenslee.com>, Karen Dailey <kdailey@rhrlaw.com>, Eric Spengler <eric@sab.law>
**Subject:** RE: East penn

I will not be asking him any questions about it today.

**Christopher C. Finan**
*Attorney & NCDRC Certified Superior Court Mediator*

ROBERSON HAWORTH & REESE, P.L.L.C.
300 N. Main Street, Suite 300
P.O. Box 1550
High Point, N.C. 27261
(336) 889-8733
Fax: (336) 885-1280



\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CONFIDENTIALITY NOTICE: This electronic mail transmission has been sent by a lawyer. It may contain information that is confidential, privileged, proprietary, or otherwise legally exempt from disclosure. **The information contained in this message and any file transmitted with it is transmitted in this form based on a reasonable expectation of privacy consistent with ABA Formal Opinion No. 99-413.** If you are not the intended recipient, you are hereby notified that you are not authorized to read, print, retain, copy or disseminate this message, any part of it, or any attachments. If you have received this message in error, please delete this message and any attachments from your system without reading the content and notify the sender immediately of the inadvertent transmission. There is no intent on the part of the sender to waive any privilege, including the attorney-client privilege, that may attach to this communication. Personal messages express views solely of the sender and are not attributable to Roberson Haworth & Reese, P.L.L.C.

IRS CIRCULAR 230 NOTICE: Any federal tax advice contained in this communication (or in any attachment) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending any transaction or matter addressed in this communication.

**From:** Josh Van Kampen <josh@vankampenlaw.com>
**Sent:** Tuesday, March 1, 2022 12:41 PM
**To:** Christopher C. Finan <cfinan@rhrlaw.com>
**Cc:** Melchionni, Gary D. <gary.melchionni@stevenslee.com>; Karen Dailey <kdailey@rhrlaw.com>; Eric Spengler <eric@sab.law>
**Subject:** Re: East penn

Chris,

Good news. I spoke with Andrew moments ago and he was able to amend his report. I expect it via email any minute and will provide to you ASAP. As I understand it, he just added a paragraph about the master list incident report and

Josh Hawley's testimony. If you need to push back start time 30 minutes to digest, that's not a problem at all. See you soon.

Be well,

Josh Van Kampen | Attorney at Law



315 East Worthington Avenue
Charlotte, North Carolina 28203
Direct Dial: (704) 919-0528
Fax: (704) 749-2638
josh@vankampenlaw.com
https://link.edgepilot.com/s/9b809610/nnMCwyRkGkaqtkHDLNz9dw?u=http://www.vankampenlaw.com/

  



---

**From:** Christopher C. Finan <cfinan@rhrlaw.com>
**Date:** Tuesday, March 1, 2022 at 12:31 PM
**To:** Josh Van Kampen <josh@vankampenlaw.com>
**Cc:** Melchionni, Gary D. <gary.melchionni@stevenslee.com>, Karen Dailey <kdailey@rhrlaw.com>, Eric Spengler <eric@sab.law>
**Subject:** RE: East penn

Josh – what was produced was what Eric requested – the safety videos. I don't intend to use them. As a professional courtesy, attached are the exhibits that I will likely use in the upcoming deposition, other than the videos taken and the Exhibit 75 photos that you already have. Among them is a single photo taken at the joint inspection (just produced) showing the slope of the shelving. It was not produced previously as it is a photo of the phone that was used to take all other photos that were produced, and as a result, was inadvertently overlooked. Of course, Eric had the same opportunity to measure the actual slope of the shelf at that inspection as well. I trust that there will be no dispute regarding this matter. If there is, feel free to state your objection on the record and we can let the Court sort it out.



# CERTIFIED SAFETY CONSULTING
Saving Lives. Preventing Injuries.

February 28, 2022

Eric Spengler
Spengler Agans Bradley, PLLC
Charlotte, NC 28204

Re: Expert Opinion — Russell Dorvit v. East Penn Manufacturing Company, Inc.

Dear Mr. Spengler,

As requested, we are pleased to send you the attached report summarizing the professional opinion following the safety review performed by Mr. Andrew Gondzur regarding the above referenced matter. We understand the reason for the assessment was to obtain an unbiased opinion of the work site and job exposures reported to have occurred at the East Penn facility to determine if they were sufficient to justify the plaintiff's refusal to perform the assigned work task.

Based upon the observations made by Mr. Gondzur it appears there are significant workplace ergonomic hazards that could be reasonably anticipated to cause an employee to experience a work-related musculoskeletal disorder as a result of the delivery of a forklift batteries.

As you are aware Mr. Gondzur is a Board-Certified Industrial Hygienist certified by the American Board of Industrial Hygiene (ABIH).

As pointed out in the stated purpose of the report, all of the comments and observations are Mr. Gondzur's opinions, and they may not necessarily agree with other professionals.

Thank you for asking Certified Safety Consulting, LLC to perform this review. If you have further questions, please feel free to call on us.

If you have any questions or comments regarding this letter, please feel free to contact Andrew Gondzur at any time.

Sincerely yours,

*[signature]*

Andrew W. Gondzur, CPE, CIH, CSP
President/Owner

(BCPE-issued Certificate No. 1617; ABIH-issued Certificate No. 10353 CP; BCSP-issued Certificate No. 20305)

3921 Connecticut Street Saint Louis, MO 63116   T 314-660-7238   E certifiedsafety@me.com   W www.certfiedsafetyconsulting.com

Case 1:21-cv-00229-NCT-JEP   Document 24-2   Filed 04/01/22   Page 4 of 11

The following represents my Rule 26 Report in the matter of Russ Dorvit vs. East Penn Manufacturing. It is based on review of materials submitted to me by your office (enumerated later), my involvement in cases involving workplace exposures, incidents and accidents, my education and experience as an occupational safety and health professional and a Certified Professional Ergonomist, my experience auditing workplaces for OSHA (Occupational Safety and Health Administration) compliance and my teaching of OSHA Standards courses at the Center for Environmental Education and Training—OSHA Education Center at Saint Louis University, as well as my knowledge of occupational risk, controls, regulations and compliance, and manual material handling practices and procedures. **I reserve the right to amend this report if other evidence becomes available.**

## ERGONOMICS AND THE ERGONOMICS PROCESS

Ergonomics is the study of work, fitting the job to the worker, rather than the other way around. When ergonomics is neglected, the risk for workplace-related musculoskeletal disorders increases.

Musculoskeletal disorders (MSDs) affect the muscles, nerves and tendons. Work-related MSDs or WMSDs (including those of the neck, upper extremities and low back) are one of the leading causes of lost workday injury and illness. Workers in many different industries and occupations can be exposed to risk factors at work, such as lifting heavy items, bending, reaching overhead, pushing and pulling heavy loads, working in awkward body postures and performing the same or similar tasks repetitively. Exposure to these known risk factors for MSDs increases a worker's risk of injury.

However, WMSDs can be prevented. Ergonomics — fitting the job to the person — helps lessen muscle fatigue, increases productivity and reduces the number and severity of work-related MSDs.

Implementing an ergonomic process has been shown to be effective in reducing the risk of developing MSDs in industries as diverse as construction, food processing, office jobs, healthcare, delivery and warehousing. Such a process would include the following:
- Provide Management Support - A strong commitment by management is critical to the overall success of an ergonomic process. Management should define clear goals and objectives for the ergonomics process, discuss them with their workers at safety meetings, assign responsibilities to designated staff members, and communicate clearly with the workforce.

Page 2

3921 Connecticut Street  Saint Louis, MO 63116    T 314-660-7238    E certifiedsafety@me.com    W www.certfiedsafetyconsulting.com
PLAINTIFF 000698

Case 1:21-cv-00229-NCT-JEP   Document 24-2   Filed 04/01/22   Page 5 of 11

- Involve Workers - Employers should implement a participatory ergonomic approach, where workers are directly involved in worksite assessments, solution development and implementation. Workers:
  - Identify and provide important information about hazards in their workplaces.
  - Assist in the ergonomic process by voicing their concerns and suggestions for reducing exposure to risk factors and by evaluating the changes made as a result of an ergonomic assessment.
- Provide Training - Training on the ergonomic process, as well as safe lifting techniques, stretching and ergonomic injury prevention, should occur. It ensures that workers are aware of ergonomics and its benefits, become informed about ergonomics related concerns in the workplace, and understand the importance of reporting early symptoms of MSDs.
- Identify Problems - Employees should be able to identify and assess ergonomic problems in the workplace before they result in MSDs.
- Encourage Early Reporting of MSD Symptoms - Early reporting can accelerate the job assessment and improvement process, helping to prevent or reduce the progression of symptoms, the development of serious injuries, and subsequent lost-time claims.
- Implement Solutions to Control Hazards - There are many possible solutions that can be implemented to reduce, control or eliminate workplace MSDs.
- Evaluate Progress - Established evaluation and corrective action procedures need to be in place to periodically assess the effectiveness of the ergonomic process and to ensure its continuous improvement and long-term success. As an ergonomic process is first developing, assessments should include determining whether goals set for the ergonomic process have been met and determining the success of the implemented ergonomic solutions.

Note: An ergonomic process uses the principles of an Injury and Illness Prevention Program to address MSD hazards. Such a process should be viewed as an ongoing function that is incorporated into the daily operations, rather than as an individual project.

## ASSUMPTIONS
### Plaintiff Alleges The Following:

Page 3

3921 Connecticut Street Saint Louis, MO 63116   T 314-660-7238   E certifiedsafety@me.com   W www.certifiedsafetyconsulting.com

PLAINTIFF 000699

Case 1:21-cv-00229-NCT-JEP   Document 24-2   Filed 04/01/22   Page 6 of 11

- East Penn employed Russ Dorvit at its distribution facility located in Winston-Salem, North Carolina.
- Dorvit worked as a straight truck driver for East Penn based out of the HPSD. He made deliveries throughout North Carolina, South Carolina, and Virginia.
- In January 2019, Dorvit struggled physically to retrieve "junk" batteries from a UPS facility in a safe manner.
- The spent batteries were stored on a rack in a small tool room at the UPS facility, and the only way for Dorvit to remove the batteries was to pull them out on his hands and knees, while in a small space. The maneuver was awkward and difficult for Dorvit.
- The tight space prevented Dorvit from being able to use proper equipment, such as a hand cart, to move the batteries, and Dorvit was concerned about the risk of injury of twisting and pushing/pulling on his hands and knees.
- Dorvit first spoke to supervisor, Zach Christie, about his workplace safety concerns regarding the UPS facility, and Christie did not offer any solutions.
- On May 22, 2019, Dorvit dropped several batteries off to Atlantic Coast Toyota Lift ("ACTL"). Dorvit had serviced ACTL, without incident, since November 2015.
- ACTL stored batteries on a rack with slanted shelves, similar to how milk is shelved in grocery stores.
- East Penn had a "first in first out" ("FIFO") policy for stocking battery racks, meaning the oldest batteries were to be displayed at the front of the rack, with newer batteries at the rear of the rack.
- ACTL's rack was designed, per manufacturer's specifications, to be loaded from the rear. *FOR REFERENCE SAKE, NOTE THAT ONE MANUFACTURER OF SIMILAR SHELVING sells Rousseau Shelving with Sloped Shelves that provides gravity flow storage. With an average slope of 15 degrees, sloped shelves are designed for rear loading applications (also known as a flow rack). These units help to create a "first in, first out" (FIFO) system.]*
- ACTL's facility was disorganized, and the company's battery rack was positioned with the rear of the rack against a wall.
- ACTL stored batteries on the bottom shelf of the rack, just above floor level.
- When Dorvit first started delivering to ACTL, he would get down on his hands and knees on the floor, pull out all the old batteries, and push the newly delivered batteries to the back of the rack, and then load the old batteries back in last, against the weight of all the other batteries.
- Loading the rack in this way was a safety hazard and increased the risk of occupational injury to Dorvit, in violation of East Penn's policies.
- East Penn's policies for reducing occupational injuries maintain that "body posture is critical" and warns that "lifting and twisting to move product may get backs and knees outside the normal range of motion."

3921 Connecticut Street Saint Louis, MO 63116    T 314-660-7238    E certifiedsafety@me.com    W www.certfiedsafetyconsulting.com

PLAINTIFF 000700

Case 1:21-cv-00229-NCT-JEP   Document 24-2   Filed 04/01/22   Page 7 of 11

- East Penn's code of conduct further required Dorvit to "use equipment properly and as designed."
- East Penn required, "[a]s a condition of employment," that Dorvit be "responsible for performing his or her job safely and for minimizing the risk of injury to" himself and others.
- East Penn further required that Dorvit to "[a]lways promptly report unsafe conditions and acts to [his] supervisor" and "[u]se equipment properly and as designed."
- At the time of his termination, Dorvit was fifty-two (52) years old and had a history of a bad elbow and knee. Dorvit had elbow surgery in 2011 or 2012 and arthroscopic knee surgery in 2013. Dorvit disclosed his full medical condition, including his prior surgeries, in his employment application materials to East Penn.
- In recognition of the safety hazards posed by improperly loading the battery rack on his hands and knees, Dorvit asked the customer representative at ACTL, in late 2015 or early 2016, if ACTL could move the rack out a few feet for proper loading.
- The customer representative responded that he did not know why Dorvit was even stocking the rack because all other drivers left the battery deliveries on the floor for ACTL's stock person to put the batteries on the rack, and this arrangement was acceptable to ACTL.
- Christie directed Dorvit, going forward, to get on his hands and knees and load the batteries from the front of the rack, in a manner that the rack was not designed to be loaded.
- Dorvit told Christie that loading the rack in that manner was an unsafe practice and could lead to workplace injury. Dorvit said he was not paid enough money to crawl on his hands and knees to put batteries on the rack in an unsafe manner.
- Dorvit satisfied his responsibilities under East Penn's company policies, and exercised his rights to a safe workplace under North Carolina law, by reporting safety issues with the battery racks at the UPS and ACTL facilities.
- On May 31, 2019, Snyder informed Dorvit he was terminated for insubordination. East Penn terminated Dorvit's employment after he voiced complaints about workplace safety.

**Professional Opinions and Basis for these Opinions**

In my professional opinion the subject workplace, and work therein, were unsafe and unreasonably dangerous, as designed, for one or more of the following reasons:

Page 5

3921 Connecticut Street  Saint Louis, MO 63116    T 314-660-7238    E certifiedsafety@me.com    W www.certifiedsafetyconsulting.com

PLAINTIFF 000701

Case 1:21-cv-00229-NCT-JEP    Document 24-2    Filed 04/01/22    Page 8 of 11

1. OSHA routinely informs employers they must follow manufacturer's guidelines when using third party equipment and machinery. For this reason positive steps must be taken to ensure heavy or bulky items are loaded from the rear in a FIFO-designed system within a sloped shelf rack.
2. Safe ergonomic practices specify that risk factors for musculoskeletal disorders (MSDs) are forceful exertion, awkward posture, contact stress and excessive repetition, among others, and when two or more risk factors are present there is significant increase in the risk of experiencing an MSD over time.
3. Loading a rack at floor level from the front with heavy batteries significantly increases the risk of musculoskeletal disorder due to a combining of risk factors, as described below:
   3.1. Forceful exertion of pulling out older batteries weighing from 30 to 50 pounds with shoulder extension while in an extremely awkward posture kneeling on a hard surface, coupled with twisting and contact stress both from kneeling on floor and leaning or resting on hard shelf and/or hard shelf edge.
   3.2. Forceful exertions of pushing a series of two or more batteries weighing from 30 to 50 pounds, up an approximate 15 to 20 degree slope, against the force of gravity, with shoulder extension while in an extremely awkward posture kneeling on a hard surface while experiencing contact pressure or contact stress from the floor, shelf and shelf edge.
4. If I were contracted by an employer to perform a job hazard analysis on a task such as the one described herein, I, or any professional ergonomist, would highlight the task as requiring a formal, on-site ergonomics analysis and pursuant to the findings I would likely recommend an immediate redesign of the job.
5. Mr. Dorvit reports that during prior deliveries he pointed out that this type of rear-loading rack should be positioned away from the wall, as per the manufacturer, and as seen routinely at the vast majority of other customer sites. Such positioning would allow access for safe loading, not only by East Penn personnel but also by their customers' in-house personnel. Had the shelf been positioned properly the ergonomic injury risks could have been significantly reduced or eliminated and this entire incident could have been prevented. Several weeks after Dorvit's termination ACTL relocated the rack away from the back wall allowing access to safely load from the rear, indicating ACTL likely recognized the hazard of its original position.
6. One of the requirements of proper safety management is the performance of a hazard evaluation. When a business involves a changing workplace due to, for instance, delivery work, one approach is to perform a site-specific hazard evaluation through conducting a job hazard analysis (JHA) or job safety analysis

Page 6

3921 Connecticut Street Saint Louis, MO 63116   T 314-660-7238   E certifiedsafety@me.com   W www.certifiedsafetyconsulting.com
PLAINTIFF 000702

Case 1:21-cv-00229-NCT-JEP   Document 24-2   Filed 04/01/22   Page 9 of 11

(JSA). These tools are used to pre-plan the work, identify all of the potential hazards that may be faced in the course and scope of that work, and define the controls the employer will implement to protect the employees from the hazards. There was no evidence discovered that East Penn conducted a JHA for this particular job. Such a JHA would have identified the need for training on hazard recognition, awareness of ergonomics risk factors that employees might encounter on a job site, and the need for control measures to remedy the risk factors.

7. A review on 2/27/2022 of additional evidence East Penn's injury and illness logs finds more than one incidence of a WMSD (workplace musculoskeletal disorder) among the job title of driver. This should raise a red flag that employees may be exposed to uncontrolled, recognized hazards that should be investigated and mitigated.

## Information considered in Formulating the Above Opinions

Page 7

3921 Connecticut Street Saint Louis, MO 63116   T 314-660-7238   E certifiedsafety@me.com   W www.certfiedsafetyconsulting.com
PLAINTIFF 000703

Case 1:21-cv-00229-NCT-JEP   Document 24-2   Filed 04/01/22   Page 10 of 11

1. 0007-DEKA-SLI-Spec-Sheet
2. 2021.03.22 [Doc. 1-2] Exhibit 2 - Driver Code of Conduct
3. 2021.03.22 [Doc. 1-3] Exhibit 3 - Workplace Safety Policy
4. 2021.03.22 [Doc. 1-4] Exhibit 4 - Company Code of Conduct
5. 2021.03.22 [Doc. 1] Complaint
6. Consulting Agreement with SAB re CIH, CPE A Gondzur
7. EPM 00065-66
8. Consultation with current and former St. Louis Area OSHA Compliance Officers M. Martin and L. Darrow, respectively
9. Consultation with Mr. Russell Dorvit
10. EPM 0000070
11. Letter to Andrew Gondzur - Dorvit v. East Penn
12. Plaintiff 000065-Plaintiff 000066
13. Photos from Plaintiff 000089-Plaintiff 000090
14. Knowledge, training and experience as a Certified Professional Ergonomist, Certified Safety Professional and Certified Industrial Hygienist including ten years experience in teaching OSHA Standards at Saint Louis University.
15. Training and experience as a loss control engineer and applying that to risk assessment.
16. Knowledge of musculoskeletal disorder hazard analysis and control policies and procedures during and subsequent to my employment at a manufacturer, distributor and warehouser, U.S. Paint Corporation.

## Attachments

Attached and made a part of this report are my Curriculum Vitae (Exhibit A) and a list of *zero* cases I have testified, by deposition and/or during trial, in the past four years (Exhibit B). Also attached is a copy of OSHA's webpage on Ergonomics Standards and Enforcement FAQs (Exhibit C).

## Compensation

My fee schedule is $150.00 per hour plus expenses. To review all materials to date and prepare this report, I have been compensated approximately $3000.00.

Page 8

3921 Connecticut Street  Saint Louis, MO 63116  T 314-660-7238  E certifiedsafety@me.com  W www.certfiedsafetyconsulting.com
PLAINTIFF 000704

Case 1:21-cv-00229-NCT-JEP  Document 24-2  Filed 04/01/22  Page 11 of 11