1   increases," and it gets the attention of someone who

2   has practiced ergonomics and someone who has kind of

3   honed their ergonomics eye.

4        Q.  Now how does that specific sentence in your

5   report relate to the facts of this case as you

6   understand them?  Is there something you're implying

7   there?  I'm just trying to understand why that

8   sentence sticks out to you in regard to the facts of

9   this case.

10       A.  In regards to the facts of this case, I saw

11  many examples of where ergonomics was communicated and

12  implored to workers and that it would assist the

13  company if more than just safety folks or managers

14  took on the responsibility of being an everyday safety

15  inspector, which would include ergonomics; that, in

16  fact, the individual workers who are given ergonomics

17  awareness training either in person or in toolbox

18  talks or tailgate safety meetings, that individual can

19  improve their ergo eye, keep an eye for hazards, point

20  them out, and ask for interventions or assessments and

21  mitigations because of risks they would encounter.

22            When I looked at the evidence of this case,

23  that jumped out at me, that there were well-designed

24  flow racks and shelving that were being used counter

25  to their ergonomic design and counter to the

**Legal Reporting Services  (336) 884-1315**

1  principles that East Penn espoused in their safety

2  memos and safety training when it comes to ergonomics

3  and utilizing the employee as an additional set of

4  eyes out there looking for hazards and correcting them

5  if they can or reporting them if they can't.

6       Q.   To be clear, sir, though, you have not seen

7  all of the evidence in this case, have you?

8       A.   It's hard for me to know.

9       Q.   Okay.  Let me just drop down a little bit in

10  your report.  I'm now going to page 4 where it says,

11  "Assumptions."  Do you see that?

12       A.   Yes.

13       Q.   That page "Assumptions" and then on to page

14  5 -- pages 4 and 5 of your report, are those all of

15  the assumptions that formed the basis for your

16  opinions reached in this case?

17       A.   Restate that, please.

18       Q.   Are all of the assumptions listed on pages 4

19  and 5 of your report the assumptions you used in

20  reaching the opinions that you set out in this report?

21  I want to understand the basis -- the factual basis of

22  the opinions that you've laid out in your report here.

23       A.   I believe that those assumptions that you're

24  scrolling past---

25       Q.   Yes.  And feel free to tell me to go back,

**Legal Reporting Services  (336) 884-1315**

1   up, down, whatever you'd like.

2        A.    That's okay.  I also have a paper copy of the

3   November report.  Those assumptions listed include

4   "Plaintiff alleges the following."  So those would not

5   be all of the assumptions.  Those would be the

6   assumptions elaborated as what the Plaintiff alleges

7   in the evidence provided to me.

8        Q.    Okay.  Let me just try to make sure that I

9   understand exactly what factual basis -- because an

10   opinion, I think you would agree, is only as good as

11   the facts that it's based upon.  Would you agree to

12   that general principle?

13        A.    Generally, yes.

14        Q.    So if you don't have the full facts or you

15   have incorrect facts, that's going to influence the

16   opinions that you're giving in any particular

17   situation; is that fair to say?

18        A.    I think so, yes.

19        Q.    So if some of the facts that are listed in

20   the "Assumptions" section of your report are

21   inaccurate or are different than what is set forth

22   there, that could potentially impact your opinion; is

23   that fair to say?

24        A.    Say that one, one more time, please.

25        Q.    Sure.  If the true facts of the case or there

**Legal Reporting Services  (336) 884-1315**

1  are additional facts that are not listed in your

2  assumptions and you didn't take them into account,

3  that could impact the opinions you reached in regard

4  to this matter; is that fair to say?

5       A.   I might agree with the first part of that,

6  but not the part about assumptions and things that I

7  considered.  This list of assumptions does not list

8  everything.  It's not---

9       Q.   Then, I'd like to know what else you

10  considered besides these assumptions, other than just

11  simple, you know, general things that you are

12  propounded to be an expert upon, matters of

13  ergonomics, good practices, and things of that nature.

14  But the underlying facts, I would like -- I want to

15  understand all of the underlying facts that you relied

16  upon in forming the opinions in this case.  Do you

17  understand the question I'm asking?

18       A.   Right.  So if you're saying excluding my

19  professional experience, education, and so on---

20       Q.   That's correct.

21       A.   ---then I believe I would agree with you that

22  the assumptions -- those are the assumptions.

23       Q.   Got you.  And so my next point was that if

24  some of the assumptions that you have recognized in

25  your report and used as the basis for the formation of

**Legal Reporting Services  (336) 884-1315**

1    your opinions, if those assumptions are different or

2    contrary to some of the facts that you've relied upon

3    in forming your opinions, would it be fair to say that

4    could affect the opinions that you ultimately reach

5    with regard to this case?

6         A.   Yes.

7         Q.   Okay.  So that's that section.  Was there

8    anything---  I just want to jump back because I want

9    to understand kind of the overall substance of your

10   report.

11        Was there anything else that was sticking out

12   to you in the "Ergonomics and the Ergonomics Process"

13   section of your report beginning on page 2 that

14   relates directly to this case?  I'm sorry.

15             THE WITNESS:  I have a dry mouth and

16             need to use the restroom, so I would like to

17             request we take a break.

18             MR. FINAN:  Yeah.  Can you just answer

19             that one question, and then I'm happy to do

20             that for you.

21        A.   I would need to very quickly look at my

22   "Ergonomics and the Ergonomics Process" and tell you

23   if there were things in here that jumped out at me.  I

24   don't have them top of mind at this point.

25        Q.   Got you.  I guess my more general question

**Legal Reporting Services  (336) 884-1315**

1    Eastern?

2              MR. FINAN:  That's fine.

3              THE WITNESS:  Thank you.

4              **(A brief recess was taken from 1:56 p.m.**

5    **to 2:06 p.m.)**

6              MR. FINAN:  All right.  We're back on

7    the record.

8    Q.   (By Mr. Finan)  Mr. Gondzur, I'm going to

9    share my screen again here.  Are you able to see my

10   screen now?

11   A.   Yes.

12   Q.   Okay.  And what I've done is, I've gone to

13   the sixth page of your 14-page report.  Do you see

14   that?

15   A.   Yes.

16   Q.   And there's a section that's entitled,

17   "Professional Opinions and Basis for these Opinions."

18   Do you see that?

19   A.   Yes.

20   Q.   It reads, "In my professional opinion, the

21   subject workplace, and work therein, were unsafe and

22   unreasonably dangerous as designed for one or more of

23   the following reasons."  I want to understand all of

24   the opinions that you hold in this case.

25             Is your opinion in this case stated in the

1    highlighted text?

2        A.    Yes.

3        Q.    Okay.  Are there any other opinions besides

4    the highlighted section that I just read into the

5    record that would dictate any other opinions that you

6    hold in regard to this case?

7        A.    No.

8        Q.    Okay.  So that is the singular opinion that

9    you have reached in regard to this case, is that

10   correct?

11       A.    Yes.

12       Q.    Okay.  When you reference "the subject

13   workplace," where are you referring to?

14       A.    The sites including the home base and the

15   field locations, customer sites, the vehicle itself

16   that the route driver would drive, anything that would

17   be considered a workplace in the course and scope of

18   Mr. Dorvit's work -- the Plaintiff's work.

19       Q.    So you considered every one of his over 200

20   customers as part of your report; is that what you're

21   saying?

22       A.    I'm saying a sampling of them.

23       Q.    Okay.  Did you consider the Atlantic Coast

24   ToyotaLift site?  Do you know what I mean what I say

25   that?

1      A.   Yes, sir.

2      Q.   Okay.  Are there any other sites that you

3  specifically considered in reaching your opinion in

4  this case?

5      A.   There are additional sites, a UPS site.

6      Q.   The way I understand your report, your

7  opinion is what we've just read into the record, and

8  it's -- the reasons that support it are listed here in

9  numbers 1, 2, 3, 3.1, 3.2, 4, 5, and 6, correct?

10      A.   Yes.

11      Q.   Do those six bullet points and two sub-bullet

12  points represent the full basis for the opinions that

13  you've reached in this case set out in your report?

14      A.   Yes.

15      Q.   Are there any of the items that are listed in

16  1 through 6, inclusive, that reference any particular

17  task performed by Mr. Dorvit at the UPS site?

18      A.   That list---  I'm sorry.  Would you rephrase

19  that?

20      Q.   Sure.  In those numbers 1 through 6,

21  inclusive, are there any of the items that are listed

22  there that would reference your evaluation of a

23  particular condition that would have existed at the

24  UPS site?

25      A.   Do you mean exclusively and only at the UPS

**Legal Reporting Services  (336) 884-1315**

1   site---

2       Q.   Yes, exclusively that relate specifically to

3   the UPS site.

4       A.   No.

5       Q.   Are there any that are listed that relate

6   specifically to the Atlantic Coast ToyotaLift site?

7       A.   I think I'm confused by your questioning.

8       Q.   Sure.  I'm just trying to figure out --

9   because they're all very general statements other than

10  what appears under numbers -- item numbers 3, 3.1, and

11  3.2.  Do you see those items there?

12      A.   Uh-huh.

13      Q.   And with regard to the condition that you

14  found to be, quote, "unsafe and unreasonably

15  dangerous," I'm trying to understand exactly what

16  facility you are pointing to as the basis for your

17  opinion.

18           And the only one I see here that's listed

19  appears to match up with the shelving unit at Atlantic

20  Coast ToyotaLift; is that fair to say?

21      A.   Yes, that's fair to say.

22      Q.   Okay.  So you didn't specifically include or

23  review any of the other details of any other site

24  besides Atlantic Coast ToyotaLift in forming your

25  opinion that there was an unsafe and unreasonably

1  dangerous condition, is that correct?

2      A.   Not in this report, that's correct.

3      Q.   Okay.  And then in terms of -- I'm going to

4  just run through the whole thing.  You've listed

5  information considered in formulating the above --

6  this opinion.

7          Is that a complete listing of the items and

8  documents that you considered in formulating your

9  opinions?

10     A.   Yes.

11     Q.   Did you prepare this report yourself or did

12 somebody prepare it for you on your behalf?

13     A.   I prepared it myself.

14     Q.   Have you prepared any other expert reports

15 prior to this one in your service as an expert

16 witness?

17     A.   Yes, I have.

18     Q.   Okay.  And, then, you are being paid for your

19 services, correct?

20     A.   Yes.

21     Q.   And is the rate of 150 per hour an accurate

22 identification of your compensation per hour in this

23 matter?

24     A.   For the file review component, yes, not for

25 the deposition.

**Legal Reporting Services  (336) 884-1315**

1    Q.   Okay.  And have you been asked to perform

2  additional services beyond the initial file review

3  that would result in you charging more than $3000 for

4  your testimony in this case?

5    A.   I would have to look at my billable hours

6  spreadsheet to answer that.

7    Q.   Okay.  I want to go back up---

8    A.   I can tell you that $3000 was -- that number

9  is the retainer.  That wasn't a line item invoice type

10  of approach.

11    Q.   Got you.  And have you expended the full

12  amount of that retainer as of today?

13    A.   Again, I would have to look at my spreadsheet

14  to know that.

15    Q.   Sure.  I'm going back to the first page of

16  your report, and I want to -- we've now narrowed down

17  that you have one opinion in this case, that the work

18  site was purportedly unsafe and unreasonably dangerous

19  and that your analysis of the basis for that focused

20  on Atlantic Coast ToyotaLift's location.

21         I want to get back to this sentence again

22  here.  Are you also aware that Mr. Dorvit ultimately

23  refused to perform a task that led to his termination?

24    A.   Yes.

25    Q.   Do you know what the specific task was that

**Legal Reporting Services  (336) 884-1315**

1    Mr. Dorvit was asked to perform that he refused to do?

2         A.   It involved the delivery of batteries at the

3    facility.

4         Q.   The Atlantic Coast ToyotaLift facility?

5         A.   Yes.

6         Q.   Sorry.  Was that a yes?  It kind of cut out.

7         A.   Yes, sir.

8         Q.   Okay.  And so it's your understanding that he

9    was terminated as a result of his refusal to rack

10   batteries on the shelves at Atlantic Coast ToyotaLift;

11   is that fair to say?

12        A.   If I recall correctly reading the documentary

13   evidence and previous depositions, there may have been

14   extenuating circumstances beyond just that, but I

15   believe that the major focus was his refusal to

16   perform that work task that he believed was unsafe.

17        Q.   Okay.  In your analysis of the situation that

18   led you to form the opinion that you hold and have

19   expressed in this report, do you know the specifics of

20   the circumstances that relate to which shelf

21   Mr. Dorvit refused to rack batteries on?

22        A.   I understand it was the second from the

23   bottom.

24        Q.   Okay.  Now where in your assumptions is that

25   recited?  Because in looking through your statement of

1    assumptions--- Do you see where I've highlighted on

2    page 4?

3         A.   Yes.

4         Q.   Okay.  Is there something else in the report

5    that would indicate that you analyzed and that your

6    opinion is based upon his refusal to rack batteries on

7    the second shelf up from the floor rather than the

8    bottom shelf just above floor level?

9         A.   I don't believe there's anything else in my

10   report that references that.

11        Q.   Okay.  And, again, going to the basis for

12   your opinion, do items number 3.1 and 3.2 only relate

13   to Mr. Dorvit's purportedly having to place batteries

14   on the very bottommost shelf?

15        A.   They are focused on the bottommost shelf;

16   this is true.

17        Q.   And it says right here, "Loading a rack at

18   floor level"?

19        A.   Yes.

20        Q.   It's fair to state, then, that in numbers 3,

21   3.1, and 3.2, those bases for your opinion focus

22   exclusively on the rack at the floor level, correct?

23        A.   I'm sorry.  Say that one more time.

24        Q.   Sure.  It's fair to say, then, that the --

25   what you list in numbers 3, 3.1, and 3.2 are focused

Case 1:21-cv-00229-NCT-JEP   Document 24-5   Filed 04/01/22   Page 13 of 32

1   exclusively -- this is on page 6 of your report -- are

2   focused exclusively on the racking of batteries at the

3   very bottom level of the shelving system; is that fair

4   to say?

5        A.   I don't know if I'd use the word

6   "exclusively," but certainly, the emphasis there was

7   on that---

8        Q.   Well, it states right here -- it says,

9   "Loading a rack at floor level from the front with

10  heavy batteries significantly increases the risk of

11  musculoskeletal disorder due to a combining of risk

12  factors as described below"?

13       A.   Sure.

14       Q.   Is there any discussion of the second shelf

15  at all in that paragraph 3?

16       A.   There is not.

17       Q.   In numbers 1 through 6, is there any

18  discussion of the second shelf at all anywhere?

19       A.   No.

20       Q.   Okay.  So is it fair to say that in reaching

21  the opinion that you reached in this case that there

22  was an unsafe and unreasonably dangerous condition,

23  you focused exclusively on the shelf at the floor

24  level, correct?

25       A.   What was the beginning of that sentence?  Is

**Legal Reporting Services  (336) 884-1315**

1    there any what?

2        Q.    In reaching the opinion that you've reached

3    that there was an unsafe and unreasonably dangerous

4    workplace condition, you focused your analysis only on

5    the racking at the very floor level at Atlantic Coast

6    ToyotaLift, correct?

7        A.    No.  I was looking at evidence regarding the

8    entire rack and the practice of being asked to load a

9    first in, first out rack from the front.  It wasn't

10   just the bottom shelf.  It's just that the bottom

11   shelf was called out specifically in the assumptions

12   and then called out in this report, but the items 1

13   and 2, for instance, are not exclusively to the bottom

14   shelf.

15       Q.    Okay.  Do they state anything at all about

16   the bottom shelf?  They don't appear to, to me.  You

17   tell me.

18       A.    Items 1 and 2, right, they do not -- they do

19   not call out shelf height.

20       Q.    Right.  And they seem to me to be more, I

21   would call them, general statements rather than

22   statements that are specific to the facts of this

23   case, correct?

24       A.    No, I wouldn't say that.  Those facts have to

25   do with the entire shelving system, and the risk to an

**Legal Reporting Services  (336) 884-1315**

1    individual pushing batteries up a slope is not a risk

2    I would reconsider at certain heights.  We're also

3    looking at the forces involved as batteries are in

4    series in a column on a shelf at any height.

5         Q.   To be clear, you did not perform any personal

6    analysis or calculation of any kind with respect to

7    any force that would be required to move any of the

8    batteries on either the bottommost shelf or the second

9    shelf up from the floor in this case, did you?

10        A.   That's correct.

11        Q.   You have not performed any such calculation

12   at all, have you?

13        A.   No quantitative analysis has been performed

14   by me.

15        Q.   Okay.  And you didn't personally visit and

16   inspect the location to reach the conclusions that

17   you've reached and the opinion that you've included in

18   your report in this case, did you?  I'm sorry?

19        A.   Would you say that one more time, please.

20        Q.   You didn't personally visit and inspect the

21   location in connection with your reaching the

22   conclusions and providing the opinion that you've

23   provided in this case, did you?

24        A.   I did not personally inspect the site.  I

25   formed my opinion based on looking at the documentary

**Legal Reporting Services  (336) 884-1315**

1  evidence, the photos because this was, in my opinion,

2  an obvious set of circumstances, that the hazards were

3  obvious and could be such that a quantitative analysis

4  could be replaced with a qualitative one, where you're

5  not looking at degrees of hazard but rather hazard in

6  a greater -- more big picture concept.

7      Q.   Okay.  So in terms of the second shelf again,

8  I want to understand exactly what portions of these

9  items numbered 1 through 6 on your report relate in

10  any way to your opinion with respect to the placement

11  and loading of batteries on the second shelf of the

12  rack.

13          Again, I think we've established that 3 and

14  its subparts relate only to the floor-level rack,

15  correct?

16              MR. VAN KAMPEN:  Objection.

17          Mischaracterizes his testimony.

18      Q.   You can answer.

19              THE WITNESS:  I answer?

20              MR. VAN KAMPEN:  Yeah.  I objected and

21          said it mischaracterizes the testimony.  You

22          can answer.

23      A.   I would not say point 3 is exclusive,

24  although it mentions the rack at floor level.  The

25  forceful exertions of pushing and pulling batteries

**Legal Reporting Services  (336) 884-1315**

1    exist at any level on a racking system like this, and

2    certainly points 1, 2, 4, 5, and 6 are in relation to

3    the entire shelving system, each rack level.

4        Q.   Again, tell me -- I think 3, as I'm reading

5    it, relates specifically to the floor-level rack.  It

6    says, "Loading a rack at floor level," at the very

7    beginning and then describes under 3.1 and 3.2 the

8    things that relate to that rack.

9            Tell me where in points 1, 2, 4, 5, or 6

10   there is anything that relates to the middle -- second

11   shelf rack?

12       A.   Points 1, 2, 4, 5, and 6 imply the entire

13   racking system.  They don't call out a specific rack.

14       Q.   Okay.  You make a statement here, "Several

15   weeks after Mr. Dorvit's termination---"  This is

16   under point 5.  ---"ACTL relocated the rack away from

17   the back wall allowing to safely load from the rear,

18   including ACTL likely recognized the hazard of its

19   original position."

20           You don't have any basis to make that

21   statement, do you, in terms of your own knowledge why

22   Atlantic Coast moved the shelf or if it even did?

23       A.   My basis would be my professional experience

24   in servicing and interacting with employers, observing

25   safe behaviors and unsafe behaviors, and the

**Legal Reporting Services  (336) 884-1315**

1    consequences of highlighting hazards and mitigating

2    them.  Oftentimes after an accident, you'll see a

3    reaction where adjustments are made.

4         You might even see a reaction when an

5    employer has a supervisor walk into an area.  People

6    begin to put on their safety glasses.  We call that an

7    adjustment because they know the right thing to do,

8    the safe thing to do, and they may not always do it

9    when no one's looking, but when an event occurs,

10   sometimes you'll see that adjustment activity

11   occurring.

12        I would say that I perceive this declaration

13   of them relocating as an adjustment-type behavior,

14   recognizing that it was an unnecessarily hazardous

15   position for a FIFO rack to have it against a wall

16   when it needs to be loaded from the rear.  They

17   recognized that and they likely took action based on

18   that recognition of this hazard.

19        Q.   And just to be clear, sir, that's pure

20   conjecture on your part.  You have no basis in fact

21   for knowing why Atlantic Coast actually moved the rack

22   from its original position, do you?

23        A.   That's correct.

24        Q.   How does risk---  Strike that.

25        How does any history of safety or injury---

1      Q.   Okay.  How do those -- again, going back to

2   my actual question, with respect to 3.2 -- and I'll

3   just read it, "Forceful exertions of pushing a series

4   of two or more batteries weighing from 30 to 50

5   pounds, up an approximate 15 to 20 degree slope,

6   against the force of gravity, with shoulder exertion

7   while in an extremely awkward posture kneeling on a

8   hard surface while experiencing contact pressure or

9   contact stress from the floor, shelf, and shelf edge."

10      Tell me what you're -- what are you saying

11   there?  I want to understand that paragraph.

12      A.   Sure.  Okay.  That's shoulder extension, not

13   shoulder exertion, by the way.

14      Q.   I'm sorry.

15      A.   That's okay.  So what I'm saying there is

16   that, as I stated, when analyzing a job with ergonomic

17   risk factors, when we measure the hazard and

18   approximate the risk, there are a number of inputs

19   that can affect the output, outcome, and the risk.

20      So you've got force, you've got additions to

21   force because of slope and gravity and the inherent

22   friction, and then we have the awkward posture of the

23   reach required, the extension of the shoulder.  If you

24   couple those with the risk factor of kneeling on a

25   hard surface, the contact pressure or stress from that

Case 1:21-cv-00229-NCT-JEP   Document 24-5   Filed 04/01/22   Page 20 of 32

1    kneeling as well as the contact pressure or stress

2    from the shelf and the shelf edge, that combination

3    typically results in higher hazard and higher risk.

4         Q.   That's what you're saying in 3.2?

5         A.   Yes.

6         Q.   Okay.  And was an assumption that you've made

7    in reaching that basis for your opinion under 3.2 that

8    the slope of the shelving was at a 15 to 20 degree

9    angle?

10        A.   Yes.

11        Q.   How does that impact your analysis?

12        A.   It adds an additional factor to any proposed

13   future calculation of force and hazard.

14        Q.   Just to be clear, that's not a calculation

15   you've ever performed, correct?

16        A.   Not at this ACTL site.

17        Q.   Okay.  That's correct.  You've performed them

18   in the past, but you've not performed them with regard

19   to this case, correct?

20        A.   That's correct.

21        Q.   Okay.  How would your opinion differ if it

22   were the case that the slope were actually far less

23   than 15 to 20 degrees?

24        A.   Are you saying quantify that?

25        Q.   You've not done any quantitative analysis,

1    and you've, I think, used the term that all of this

2    was based upon qualitative analysis and some

3    assumptions that you made.  One of those assumptions

4    appears to be that you're dealing with a 15 to 20

5    degree slope.

6            If that slope were less than that by a

7    significant amount, how would that change your

8    conclusions?

9        A.   It would depend on how much different it is,

10   you know, how much less than that assumed or presumed

11   15 to 20 degrees.

12       Q.   How much less would be relevant in your mind?

13       A.   Probably 50 to 60 or so percent less would

14   have an impact.  It wouldn't change the hazard

15   completely, but it would probably lessen the hazard.

16   It's hard to know without, you know, doing a

17   quantitative analysis.

18       Q.   And, again, you're right.  It is difficult

19   and you did not perform one here, so I'm just trying

20   to understand the basis and the reasons why you

21   reached the conclusions that you did reach.  And if

22   there's assumptions that you've made that were

23   different than what is actually out there in the

24   field, I'm trying to learn and understand how those

25   might impact your opinions.  Do you see what I'm

1   getting at there?

2       A.   Right.

3       Q.   Okay.  Let me show you a picture.  This is

4   going to be Exhibit 82, and this has been produced

5   today.  This was a picture that was taken from the

6   site of the actual slope of the shelf.  It's not a

7   precision instrument, but this is an iPhone on the

8   shelf itself indicating that it's a five percent slope

9   rather than a 15 to 20 percent slope.  Do you see what

10  I'm showing you there?

11           (Deposition Exhibit Number 82 was marked

12           for identification.)

13           MR. VAN KAMPEN:  Chris, let me just

14           object for the record and point out that this

15           photo was taken at an inspection on land

16           occurring, I think, a year or more after the

17           actual incident on a shelf that was not in

18           the same location as the previous shelf.

19           So we're not conceding or stipulating

20           that this is the same shelf or that the shelf

21           wasn't manipulated or changed in the interim

22           period.

23           MR. FINAN:  And that's fine and feel

24           free to place your objection on the record,

25           and I'll just point you to the testimony of

Case 1:21-cv-00229-NCT-JEP   Document 24-5   Filed 04/01/22   Page 23 of 32

1      Atlantic Coast that says this is the exact

2      same shelf, configured in the exact same way

3      that it was at the time in question.  It is

4      just at a different location.

5    Q.    So with that on the record, Mr. Gondzur, it

6  appears -- I think you said that a 50 to 60 percent

7  difference would have an impact on your opinion.  This

8  is somewhere between a 75 percent difference at its

9  highest from the assumption at 20 percent that you

10 made in reaching the opinions that you did.

11      So how would -- if the shelving slope were

12 actually only five percent, how would that change your

13 opinions in this case?

14    A.    What it would do, if it were true, it would

15 lessen the slope component, but it wouldn't have any

16 impact on the friction component.  What we don't know

17 from pure slope is a measurement of the -- like the

18 coefficient of drag.  So slope is one component, but

19 it doesn't tell the whole story.

20      Even if that said, you know, a 30-degree

21 slope or a zero-degree slope, that's one component.

22 What we're after is what's the force requirement, and

23 that's the component we don't have.

24    Q.    Okay.  But, again, you've reached an opinion

25 in this case that the task was unsafe and unreasonably

1   dangerous and you based it, at least in part, upon a

2   shelf that we would contend is actually five degrees

3   in slope versus your report which says 15 to 20

4   degrees in slope.

5          You also indicate friction is a

6   consideration, is that correct?

7      A.   Right.  As a complement to gravity, we see

8   that friction has play in terms of force requirements

9   when pushing and pulling objects.

10     Q.   Okay.  So, obviously, the more force that is

11  required to move an object, the more potentially

12  unsafe or dangerous it could be; is that a fair

13  statement of a general proposition?

14     A.   Yes.

15     Q.   Okay.  So if something is relatively easy to

16  move, does that indicate a condition where there is

17  less danger present?

18     A.   It might.

19     Q.   Okay.  I'm going to show you a video---  I'm

20  going to show you a video of batteries being moved on

21  the rack and then ask to get your reaction to it.

22               **(Video played.)**

23          MR. VAN KAMPEN:  Chris, are you playing

24          this at a slow speed?

25          MR. FINAN:  No.

**Legal Reporting Services  (336) 884-1315**

1          MR. VAN KAMPEN:  Because it's -- yeah,

2     it's just looking slow to me.  Okay.

3          MR. FINAN:  I'll play it again.  It

4     might just be an Internet connection lag or

5     something like that.

6          MR. VAN KAMPEN:  Uh-huh.

7          MR. FINAN:  Let me play it again.

8          **(Video played.)**

9          MR. VAN KAMPEN:  Let me just get an

10    objection on the record.  First, can you,

11    Chris, just identify for the witness whose

12    voice it is representing that this is the

13    same rack?  Is that an East Penn employee?

14         MR. FINAN:  No.  That is the owner of

15    Atlantic Coast ToyotaLift.

16         MR. VAN KAMPEN:  All right.

17         MR. FINAN:  He was the deponent in the

18    case.

19         MR. VAN KAMPEN:  Let me just state --

20    object for the record that the batteries in

21    question are Interstate batteries that are

22    being moved, and we further object to the

23    fact that we don't know the chain of custody

24    around those batteries, whether or not those

25    batteries have their cores in them, how much

1    materials.  At the time of writing this report, I had

2    no similar documentary evidence about the particular

3    shelf in question or the racking system in question.

4    But with an average slope of 15 degrees, I believe

5    what they are implying here is that slopes can be

6    sold -- or shelving units can be sold with different

7    slopes.

8        Q.  Understood.  And what we've shown you here,

9    though -- unless you have any evidence or reason to

10   contest it -- is that the slope of this particular

11   rack was five degrees, correct?

12       A.  I do not know the slope of the rack in

13   question.

14       Q.  Okay.  What I stated and showed you was a

15   picture of a five-degree measurement taken at the date

16   of the inspection, do you any reason to believe that

17   that's inaccurate based on what you've seen?

18       A.  I have reason to believe that it's not

19   reliable based on the fact that it was an image on a

20   smart phone, not any evidence of a NIST traceable

21   scientific instrument.

22       Q.  That wasn't my question.  My question was,

23   you don't have any evidence to indicate that the

24   actual slope was 15 or five, do you?

25       A.  That's correct.

**Legal Reporting Services  (336) 884-1315**

1    Q.   Okay.  But in considering and in forming your

2    opinion, you considered a shelving system that had a

3    15-degree average slope -- 15 to 20, I think, was your

4    terminology, correct?

5    A.   Approximately.

6    Q.   Okay.  In returning to the -- I want to play

7    the video again once more.

8              **(Video played.)**

9    Q.   I want to stop the video there.  Friction was

10   another component that you indicated previously was an

11   important factor in determining the force required to

12   perform a particular task, is that correct?

13   A.   Yes.

14   Q.   In this case, does it make a difference in

15   your analysis that when the battery's moved -- and

16   assuming they've not been manipulated in any way --

17   that they stay in place on the shelves and do not

18   slide back forward towards the front of the shelving

19   unit, despite the slope of the racking system?  Does

20   that play into your analysis at all?

21          MR. VAN KAMPEN:  Objection.  I just want

22             to state for the record you mentioned

23             friction from the surface, and once again, we

24             don't know whether or not that's the actual

25             surface, whether that surface was manipulated

Case 1:21-cv-00229-NCT-JEP   Document 24-5   Filed 04/01/22   Page 28 of 32

1      with some sort of lubricant to make these

2      batteries move more easily.

3            With that, you can answer the question,

4      if you know.

5      A.   Yeah.  I would ask you to restate that,

6   please.

7      Q.   Sure.  And I think with respect to the

8   objection, just for the record, I think it might make

9   it harder.

10           Is your understanding that if these batteries

11  are required to be manipulated around on the shelves,

12  the fact that they stay put and don't slide forward to

13  the front -- is that a good thing or a bad thing?

14     A.   The fact that they stay put and don't slide

15  to the front, is that a good thing or a bad thing?

16  With a rack designed for very heavy items, the slope

17  involved is typically one that lessens the force

18  requirement, although it typically is not a sufficient

19  slope that would allow things to move on their own

20  without you inputting some pressure, if you understand

21  what I mean.

22     Q.   I think I do.

23     A.   This type of a slope -- it assists the worker

24  in manipulating things, but it's not exactly like the

25  slope you might see in, say, a grocery store where you

**Legal Reporting Services  (336) 884-1315**

1    take one item and everything comes sliding down right

2    behind it before you can even get your item off the

3    shelf.

4         Q.    The soup can dispenser?

5         A.    Right.  This design typically is -- the slope

6    is a little more gradual, and in fact, it's really

7    more about helping the delivery person than it is the

8    customer who might be removing the battery from the

9    rack.

10        Q.    Now when you---

11        A.    I'm sorry.  I'm lost in my -- in answering

12   your question, I lost myself in remembering exactly

13   what your question was.

14        Q.    That's okay.  I understand.  What I'm trying

15   to understand is, if you're not able to load this

16   rack, for whatever reason, from the rear -- and, you

17   know, obviously, we don't concede that it's supposed

18   to be loaded from the rear.

19             But if it were and the batteries, rather than

20   you having to hold them up in place -- like the soup

21   can dispenser, you'd have to hold everything in place

22   to put the one in the front because they'd all come

23   sliding down at you if you didn't -- is it a benefit

24   to the person who's racking the batteries on the

25   shelf, assuming there's enough room around them to

**Legal Reporting Services  (336) 884-1315**

1   manipulate them, that the batteries stay put on the

2   shelves by themselves and don't come sliding back to

3   the front while trying to load the batteries on the

4   shelf?

5       A.   Yes.

6       Q.   That would reduce the risk of the unsafe

7   condition, then, correct?

8       A.   You'd have to be more specific when you say

9   "that would reduce the risk."  The risk to whom and

10  from what?

11      Q.   Well, I mean, again, I'm focused on your

12  opinions in the case, and your opinion is that this

13  racking system is unsafe and -- unsafe and

14  unreasonably dangerous.

15      A.   Uh-huh.

16      Q.   And so the fact that the batteries do not

17  move around on the shelf on their own makes the

18  condition less unsafe and less unreasonably dangerous;

19  is that fair to say?

20      A.   I don't know.

21      Q.   Okay.  It's hard to determine without

22  performing a full quantitative analysis, correct?

23      A.   It's hard to determine the push-pull

24  component.  However, if you would note, in my report

25  on page 4, again, I believe -- no, not 4 -- page 6,

**Legal Reporting Services  (336) 884-1315**

1  we're also talking about pulling batteries, and that

2  pulling of batteries to exchange batteries, to remove

3  junk, or to add new batteries, that has a lifting

4  component to it, and the slope of the shelf has no

5  impact on the lifting component. The lip on the rack

6  would have an impact, and there would be no such lip

7  on the rear of the rack.

8      Q.   But you would, on the rear of the rack, have

9  a longer distance to lift, would you not?

10     A.   A longer distance to lift?

11     Q.   You have to lift it higher up?

12     A.   Right.  So that would be an additional---

13     Q.   That would be additional force required to

14 lift the battery higher, correct?

15     A.   Presumably there would be a slightly higher

16 force.

17     Q.   I want to just show you -- this is

18 Plaintiff's Exhibit -- well, it's Exhibit 75.  You can

19 see from these photographs, this is sort of the back.

20 Do you see that photo?  This is Plaintiff's -- I think

21 it's 542 Bates-numbered, and you see this is the back

22 of that bottom shelf, just for an example?

23     A.   Uh-huh.

24     Q.   It's about -- it's hard to tell because it's

25 at a little bit of an angle, but somewhere between