UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
Case No. 1-21-cv-229

| | | |
|---|---|---|
| RUSSELL DORVIT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **PLAINTIFF'S MEMORANDUM IN** |
| v. | ) | **OPPOSITION TO DEFENDANT'S** |
| | ) | **MOTION TO EXCLUDE THE REPORTS** |
| EAST PENN MANUFACTURING | ) | **AND TESTIMONY OF PLAINTIFF'S** |
| COMPANY, INC., | ) | **EXPERT WITNESS** |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

NOW COMES Plaintiff Russell Dorvit, by and through his undersigned counsel, and hereby submits this Memorandum in Opposition to Defendant's Motion to Exclude the Reports and Testimony of Plaintiff's Expert Witness:

## BACKGROUND

Andrew Gondzur is a certified industrial hygienist ("CIH") and a certified professional ergonomist ("CPE"). (Gondzur Dep. 31:5-23) The CPE certification required Gondzur to complete a board certification similar in rigor to the bar exam for attorneys or the medical boards for doctors. (*Id.* 32:8-9, 34:1-4) Gondzur is certified as a trainer by the Occupational Safety and Health Administration ("OSHA"), and he is an instructor at the OSHA Education Center at Saint Louis University: "So I train trainers who train employees and supervisors on how the OSHA standards work and how they can comply with them to reduce injuries and accidents on the job." (*Id.* 149:19-150:3)

On November 12, 2021, prior to any fact discovery from Defendant East Penn Manufacturing Company, Inc. ("East Penn"), Gondzur timely served a written report with his

expert opinion in this matter. He was retained by Plaintiff Russell Dorvit to provide an independent assessment as to whether the "work site and job exposures reported [by Dorvit] to have occurred at the East Penn facility . . . were sufficient to justify the plaintiff's refusal to perform the assigned work task." ([Doc. 24-1, p. 1]) Gondzur concluded the threat to Dorvit's safety was sufficient to justify his refusal to perform certain work loading batteries at two customer sites, Atlantic Coast Toyota Lift ("ACTL") and UPS's Greensboro facility. (*Id.*; Gondzur Dep. 46:23-47:5, 162:3-7)

Gondzur based his expert opinion on a quantitative analysis. His November 12, 2021 report concludes, "In my professional opinion, the subject workplace, and work therein, were unsafe and unreasonably dangerous, as designed for one or more of the following reasons." ([Doc. 24-1]) At that time, Gondzur's conclusion was based on Dorvit's description of the work, as alleged in the complaint, which included removing and loading heavy batteries, weighing 30 to 50 pounds, from the front of the bottom shelf of a battery rack, including while on his hands and knees. (*Id.*)

Gondzur found an "unsafe and unreasonably dangerous" work condition because the battery lifts described by Dorvit (a) included two or more risk factors for musculoskeletal disorders, i.e., forceful exertion, awkward posture, contact stress, and excessive repetition, and (b) failed to follow manufacturer's intended use for loading the rack from the rear, including as part of a first-in first-out ("FIFO") designed system with a sloped shelf rack. (Doc. 24)

East Penn disclosed Bruce Webber as a rebuttal expert. In his written report dated December 20, 2021, Webber opined that Gondzur's report lacked "context" that would be provided by data from East Penn on injuries to workers from handling batteries: "if the risk of injury was present as stated [by Gondzur] there should be incident and near miss data to support

that[,] as these functions are not new for Mr. Norvit [sic] or others in the same position at East Penn Manufacturing. Neither of these [incident reports or near miss data] were presented in the report *so I am assuming they do not exist*." (Webber Rep., p. 2 (emphasis added))

Two days later, on December 22, 2021, Plaintiff through counsel served a second set of request for documents that asked East Penn to produce "all incident reports, 'near-miss documents,'" and other documents evidencing workplace injuries related to the manual transportation of batteries, from March 4, 2015 to present. (Pl. Second Interr. Req. Docs., p. 6). Webber's assumption was mistaken: the data did exist.

On January 22, 2022, East Penn produced a document (the "Injuries Report") documenting injuries at the High Point Side Division ("HPSD," or Warehouse 30)—where Dorvit worked as one of five or six route drivers—and at neighboring facility known as the Winston-Salem Distribution Center ("DC" or Warehouse 60). ([Doc. 30-1) On January 31, 2022, pursuant to a subpoena issued by Dorvit's counsel, the parties conducted an inspection of the ACTL customer site. The parties proceed to conduct depositions with topics related to the Injuries Report, including depositions of Josh Hawkins, Dorvit's co-worker at the HPSD, on February 17, 2022; Bruce DelGabrino, the warehouse supervisor of the HPSD, on February 24, 2022; and of East Penn's corporate witness on March 2, 2022.

The Injuries Report revealed a "number of ergonomic injuries" related to battery handling, among the small handful of five or six route drivers who worked at the HPSD at any given time in the period preceding Dorvit's termination on May 31, 2019[1] (Gondzur Dep. 148:19-149:12):

---

[1] The names of the workers who suffered on-the-job injuries are omitted here (and redacted from relevant exhibits) out of an abundance of caution for privacy concerns. The only exception is Hawkins who testified voluntarily regarding his back injury from loading batteries on a customer rack.

- On <u>September 9, 2015</u>, a route driver was injured while picking up "junk" batteries (spent battery cores), which caused such severe pain in his right shoulder that he dropped the battery. (*See* Ex. 30-1, p. 1) The driver filed a workers' compensation claim and missed nearly two weeks of work, as a result of his injury. (*Id.*; Delgarbino Dep. 51:18-54:24.) On August 11, 2017, the driver ultimately resigned his employment as part of a confidential workers' compensation settlement. (*See id.*) He had been an East Penn employee of the company for 13 years. (Delgarbino Dep. 51:18-54:24.)

- On <u>June 20, 2016</u>, another route driver was injured while "lifting [a] battery to put it on [a] shelf." (Ex. 30-1) The employee reported that he could not move his right arm, as a result of his shoulder injury. (*See id.*) The driver missed an unknown amount of time from work due to his injury. (*See* Delgarbino, 38:17-39:7)

- On <u>February 26, 2018</u>, route driver Josh Hawkins hurt his lower back while lifting batteries and placing them on a shelf at a customer site. (*See* Ex. 30-1) Hawkins explained that he "threw [his] back out" while bending down and loading batteries down "somewhat low" on a battery rack at a customer site. (Hawkins Dep. 61:17, 66:2-7) His doctor wrote him out for two weeks of work as a result of injury. (*Id.* 62:3-10)

- On <u>June 25, 2018</u>, another route driver at the HPSD was injured "moving batteries, [and] started feeling tingling in [his] right arm and hand (wrist)." (*See* Ex. 30-1, p. 1) No other information was available about this injury.

- East Penn's Injuries Report further documents several additional musculoskeletal injuries suffered by employees at the neighboring DC facility related to handling batteries. (*See* Ex. 30-1, p. 2-4)

Shortly before his deposition on March 1, 2022, Gondzur supplemented his written report to add two sentences related to the Injuries Report:

> A review on 2/27/2022 of additional evidence [including] East Penn's injury and illness logs finds more than one incidence of a WMSD (workplace musculoskeletal disorder) among the job title of driver. This should raise a red flag that employees may be exposed to uncontrolled, recognized hazards that should be investigated and mitigated.

(Doc. 24-2, p. 10; Gondzur Dep. 155:9-15) The pattern of documented battery-related injuries among East Penn route drivers increased Gondzur's confidence in his conclusion that the battery lift at ACTL and UPS facilities presented an "unsafe and unreasonably dangerous" work condition that justified Dorvit's refusal to perform the lift.[2] (Gondzur 155:16-21)

## ARGUMENT

### I. Gondzur Properly Supplemented His Report Pursuant to Rule 26(e)(2).

The Amended Joint Rule 26(f) Report, filed on June 23, 2021 [Doc. 11] and approved by the Court on July 8, 2021 [Doc. 12], provides dates for expert witness disclosures and further provides, "Supplementations will be as provided in Rule 26(e) or as otherwise ordered by the court." [Doc. 11, p. 1]

East Penn's memorandum fails to analyze Rule 26(e)(2) and skips ahead to an analysis under Rule 37 for failure to comply with Rule 26. The memorandum does not even reference the sentence in the Amended Joint Rule 26(f) Report that *directly relates* to supplementation of expert witness disclosures, selectively editing the quoted from the Amended Joint Rule 26(f) Report. (*See* Doc. 24, p. 7)

---

[2] The documentation of prior related injuries is not necessary to Gondzur's conclusion of an unreasonably dangerous workplace. In his professional experience, he has "seen a significant number of jobs with inherent ergonomic risk of high severity that were not reflected in injury logs, injury reports, or even first aid logs." (*Id.* 60:25-61:3)

"Under Federal Rule of Civil Procedure 26(e), an expert report 'must be supplemented' when a 'party learns' that 'new information renders' the prior disclosure 'incomplete' in 'some material respect.'" *United States ex rel. Skibo v. Greer Lab'ys, Inc.,* No. 5:13-CV-110-MOC-DCK, 2019 WL 1992139, at *3 (W.D.N.C. May 6, 2019) (quoting Rule 26(e)). "Any additions or changes to [an] expert's report must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due." Fed. R. Civ. P. 26(e)(2). Pretrial disclosures under Rule 26(a)(3) are due, in turn, 30 days before trial, unless otherwise ordered by the court. *Id.* 26(a)(3)(B). In the context of Rule 26(e)(2), "supplementation under the Rules means correcting inaccuracies, or filling the interstices of an incomplete report based on information that was not available at the time of the initial disclosure." *EEOC v. Freeman*, 961 F. Supp. 2d 783, 797 (D. Md. 2013) (citation omitted).

Sister courts in the Fourth Circuit have applied Rule 26(e)(2) to allow parties to supplement their expert reports based on facts discovered in the litigation after the original report was served. *See, e.g.*, *United States ex rel. Skibo v. Greer Lab'ys, Inc.*, No. 5:13-CV-110-MOC-DCK, 2019 WL 1992139, at *4 (W.D.N.C. May 6, 2019) (denying motion to strike supplemental expert report after the close of fact discovery when changes to report were based on additional data produced by the opposing party after the close of fact discovery); *High Voltage Beverages, LLC v. Coca-Cola Co.*, No. 308CV367, 2010 WL 3788288, at *1 (W.D.N.C. Sept. 22, 2010) ("While perhaps overly simplified, it would be illogical to conclude that Rule 26 requires supplementation of discovery responses, but would not allow such supplemental information to be considered by an expert simply because the expert's report has been served."); *OmniSource Corp. v. Heat Wave Metal Processing, Inc.*, No 5:13-CV-772-D, 2015 WL 3452918, at *10

(E.D.N.C. May 29, 2015) (a supplemental report "may be necessary and proper when new information is obtained").

In *Southern States Rack and Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592 (4th Cir. 2003), the issue on appeal was whether the district court had abused its discretion by "excluding testimony from one of Southern States' expert witnesses *concerning a new opinion that the expert formed during trial*," *id.* at 593 (emphasis added), that is, well after the deadline for pretrial disclosures. *Southern States* addresses the factors to consider when applying Rule 37 to an instance when "[a] party that without substantial justification fails to disclosure information required by Rule 26(a) or 26(e)(1), or *amend a prior response to discovery as required by Rule 26(e)(2)*." *Id.* at 595 (emphasis added) (quoting Rule 37(c)(1)). According, the *Southern States* analysis does not come into play unless the Court first finds a violation of Rule 26(e)'s disclosure requirements.

The Amended Joint Rule 26(f) Report in this case defers to Rule 26(e) for supplementation of expert reports. Accordingly, either party may supplement their expert report pursuant to Rule 26(e) no later than 30 days before trial. The trial in this matter is not set until October 3, 2022. Plaintiff served its expert's supplemental report on March 1, 2022. The supplemental report was the same as the original report, except for a two-sentence addition. Thus, the supplemental report included "additions or changes to the original opinions," not "entirely new opinions," *Robinson v. Ethicon Inc.*, No. CV H- 20-3760, 2021 WL 4034131, at *4 (S.D. Tex. Sept. 2, 2021). Plaintiff's supplemental report was timely submitted under Rule 26(e)(2).

In the alternative, even if the Court was to apply the *Southern States* factors, East Penn cannot demonstrate unfair surprise. East Penn argues that it was caught off guard that Gondzur's

supplement addressed the "red flags" raised by the Injuries Report, that is, "a broader range of

potential injuries that East Penn's employees may have suffered on the job." (Doc. 24, p. 9) The

claimed surprise is without merit: it was *East Penn's expert* who first established the relevance

of "incident and near miss data" in questioning the reliability of Gondzur's opinion.

Similarly, East Penn cannot demonstrate an inability to cure the surprise. East Penn's

expert witness, presumably, received the Injuries Report on or before January 22, 2022. East

Penn, therefore, had more than a month, prior to Gondzur's deposition, to consult with its expert

witness regarding the significance of its own data showing numerous injuries to   Dorvit's

colleagues from handling batteries.

Moreover, counsel for Plaintiff offered to postpone Gondzur's deposition to allow

opposing counsel time to review the new material in Gonzdzur's supplemental report. (Gondzur

Dep. 21-22): As Gondzur noted at deposition, "[F]or the record, I would point out I only added

two sentences and changed nothing in the body of the report." (*Id.* 22:25-23:2) Counsel for East

Penn, however, declined all accommodations and did not propose any of his own. (*See id.*; 22:1-

14, 146-147)

A party who does not make any effort to cure "surprise" from a supplemental expert

report cannot demonstrate an inability to cure the surprise. *See, e.g.*, *Salami v. N. Carolina Agr.

& Tech. State Univ.*, 394 F. Supp. 2d 696, 710 (M.D.N.C. 2005), *aff'd*, 191 F. App'x 193 (4th

Cir. 2006) ("Plaintiff failed to make any effort to cure any surprise that did exist by using the two

remaining weeks of discovery or by accepting Defendant's offer to extend discovery or to allow

the expert's deposition to be taken outside of the discovery period.")

Continuing with application of the *Southern State* factors, Dorvit has provided ample

explanation for the alleged "failure" to disclose the additional basis for its expert's opinion. The

supplement to Gondzur's report could not possibly have occurred prior to the production of the Injuries Report on January 22, 2022, and it could not reasonably have been expected to be served prior to deposition testimony interpreting the document.

East Penn has not identified any authority for the proposition that an expert witness must supplement his report within less than a month from the earliest possible date of notice of new evidence. The two cases cited in East Penn's brief provide no support for the company's position. *See Gallagher v. S. Source Packaging, LLC*, 568 F. Supp. 2d 624, 632 (E.D.N.C. 2008) (new expert opinions not served until some 15 months after the close of discovery, as an attachment to defendant's opposition to summary judgment, in an effort "to try and stave off summary judgment"); *Contech Stormwater Sols., Inc. v. Baysaver Techs., Inc.*, 534 F.Supp.2d 616, 623-24 (D. Md. 2008) (dealing with the failure to supplement answers to interrogatories and Rule 26(a) initial disclosures, not expert reports). East Penn's only remaining argument—about the potential disruption to trial—is unarticulated and unsupported by any authority.

Finally, it must be noted that East Penn *makes no argument* that the Injuries Report is unimportant. If anything, East Penn's determined efforts to prohibit Gondzur from opining on the Injuries Report betray the data's probative value. Even East Penn's rebuttal expert admitted that the history of injuries to Dorvit's coworkers while handling East Penn's batteries would "support" Gondzur's finding of a significant safety risk, without otherwise conceding that Gondzur had established "the foundation for the finding." (Webber Dep. 148:17-19)

The Injuries Report would provide justification, in Gondzur's opinion, to investigate East Penn not only OSHA violations, but *willful* OSHA violations: "With the repeat nature of the injuries here and the documentary evidence regarding ergonomic injuries and hazards, I would

potentially pursue willful violations because the employer knew or should have known of these hazards and then should have taken steps to mitigate them." (Gondzur Dep. 147:25-152:17)[3]

## II. Gondzur's Opinions Are Sufficiently Tied to the Facts of the Case, and East Penn's Efforts to Construe the Facts in a Light *Most Favorable to East Penn* Is Inappropriate at this Stage in the Litigation.

East Penn's argument that Gondzur's opinions are insufficiently tied to the facts starts with a false premise: that Gondzur "admitted in deposition that he . . . relied exclusively upon the allegations and 'assumptions' that were provided by the Plaintiff and, in essence, taken straight from the allegations of his Complaint." ([Doc. 24], p. 4) This "admission" omits important context: at the beginning of Gondzur's deposition, counsel for East Penn objected to Gondzur's supplemental report and told Gondzur that the scope of all his questions would be limited to Gondzur's original report:

> Q. So my questioning today is going to focus exclusively on the contents of the November 12th, 2021 report submitted by you in this case, Exhibit 71. Do you understand that?
>
> A. Yes.

(Gondzur Dep. 21:3-7) It is therefore of no significant that Gondzur "admitted" that his November 12, 2021 report—issued before *any* discovery in the case—was based on the allegations in the Plaintiff's complaint.

Without justification, East Penn attempts to lock Gondzur's opinion in at an arbitrary, early date in the litigation—and then to attack the reliability of his opinions by questioning their

---

[3] To be clear, Gondzur did not offer an opinion on whether any OSHA violation had been established by the Injuries Report. (Gondzur Dep. 165:22)

connection to the facts in case discovered *after* his report was issued. East Penn cannot fairly have it both ways.[4]

Throughout their memorandum, East Penn presents the facts of the case in a light most favorable to *East Penn*, the moving party, to reach the conclusion that the assumptions relied upon by Gondzur "are demonstrably false." (Doc. 24, p. 5) Accordingly, East Penn fails to apply the proper standard of review of a motion, at this stage of the litigation.[5]

### …*"that ACTL stored the batteries involved in the ACTL Incident on the bottom shelf of the rack, nearest the floor"* (Doc. 24, p.4)

East Penn misconstrues Plaintiff's alleged "insubordination," in a self-serving manner, by focusing only on the contents of his *final delivery* of batteries to ACTL. The undisputed evidence is that Dorvit delivered batteries to ACTL that were stored on the <u>bottom</u> shelf of the storage

---

[4] Counsel for East Penn also improperly directed its expert, Webber, not to answer questions from Plaintiff's counsel related to a second customer site, UPS Greensboro. (*See* Webber Dep. 138-144). Counsel for East Penn mistakenly asserted that Gondzur's original report did not address UPS Greensboro. (*See id.*) In fact, Gondzur's November 2021 report included a detailed accounting of assumptions about the UPS Greensboro (*See* Doc. 24-1, p. 4):

- In January 2019, Dorvit struggled physically to retrieve "junk" batteries from a UPS facility in a safe manner.
- The spent batteries were stored on a rack in a small tool room at the UPS facility, and the only way for Dorvit to remove the batteries was to pull them out on his hands and knees, while in a small space. The maneuver was awkward and difficult for Dorvit.
- The tight space prevented Dorvit from being able to use proper equipment, such as a hand cart, to move the batteries, and Dorvit was concerned about the risk of injury of twisting and pushing/pulling on his hands and knees.
- Dorvit first spoke to supervisor, Zach Christie, about his workplace safety concerns regarding the UPS facility, and Christie did not offer any solutions.

Photos and text messages documenting the unsafe conditions at UPS Greensboro were not produced by East Penn, however, until months after Gondzur's original report. Gondzur testified at deposition that the UPS Greensboro facility presented another battery rack in another "unnecessarily dangerous condition" that increased the "substantial risk" of injury to Dorvit, due to "a lot of poorly designed storage systems that [the drivers] have to unload from and load into." (Gondzur Dep. 157:16-158:28) This evidence "bolster[ed]" his quantitative analysis. (*Id.* 157:16-17) Plaintiff reserves the right to introduce expert testimony at trial about UPS Greensboro.

[5] It is wholly inappropriate for East Penn to represent, as a matter of undisputed fact, that the company terminated Dorvit after "learning that the Plaintiff had lied to ACTL's representatives about a purported injury." (Doc. 24, p. 3) East Penn cites <u>no</u> evidence in the record for this contested allegation.

rack. Dorvit testified that the batteries he delivered to ACTL were stored on the "very bottom shelf." (Dorvit Dep. 124:24) *Even* East Penn admits that <u>some</u> of the batteries that  Dorvit delivered to ACTL were stored on the bottom shelf. (Doc. 24, p. 15)

But, East Penn protests, Dorvit's delivery of batteries to ACTL <u>on May 22, 2019</u> (the "ACTL Incident") did not include the particular model of batteries that were stored on the bottom shelf—only these batteries that were stored on the second-from-bottom shelf. According to East Penn, this "fact" negates the assumption by Gondzur, in his original report, that Dorvit refused to load batteries on the bottom shelf of the rack.

The fatal flaw in East Penn's logic is that Dorvit's delivery of batteries to ACTL on May 22, 2019 was <u>before</u> East Penn gave him <u>any instruction</u> to load the batteries on the rack at this customer site. The undisputed facts are that Dorvit's supervisor called him <u>after</u> his delivery to ACTL on May 22, 2019 and directed him, in the future, to load batteries on the rack at ACT. (Doc. 24-3, p.1) East Penn's memorandum admits that Dorvit's supervisor "instructed him to place the batteries on ACTL's shelving unit <u>going forward</u>." (*Id.* (emphasis added).) Dorvit responded that he had not loaded the batteries on the rack at ACTL for some time—and that he would not do so <u>in the future</u>—citing concerns about the unsafe lifting and loading required to at this customer site.[6]

 Dorvit's refusal to load batteries on the customer rack at ACTL, therefore, was not tethered to the contents of any particular delivery, and the delivery of batteries at the "ACTL Incident" on May 22, 2019 is not determinative: Dorvit objected, on safety grounds, to loading any East Penn batteries at the ACTL site, <u>including</u> those batteries that East Penn admits were

---

[6] While Dorvit told his supervisor he did not get paid enough to load batteries on his hands and knees, his objection to the instruction was based on safety concerns. The excerpts of Dorvit's deposition that East Penn included as Exhibit C end abruptly at page 121. (*See* Doc. 24-3) Three pages later, Dorvit testified, "I told [supervisor Zach Christie] right then it was a safety issue." (Dorvit Dep. 124:7)

stored on the very bottom shelf. Therefore, the assumption made by Gondzur that Dorvit refused to load batteries on the bottom shelf of the rack is supported by admissible evidence.

Even if, counterfactually, the second-to-bottom shelf was the only shelf at issue, Gondzur made clear at deposition that his opinion remained unchanged by this new "fact." (*See* Gondzur Dep. 54:7-14, 138:18-139:11, 145:17-146:5, 155:1-156:7) The unsafe condition was sufficient to justify Dorvit's refusal to perform the assigned work task, whether his assignment was to load batteries on the bottom shelf or second-to-bottom shelf (*id.* 162:3-7)—both were outside the "strike zone," to use a "baseball analogy," and "an accident waiting to happen." (*Id.* 120: 17-25; 122:22-123:1; 144:4-14). East Penn's memorandum ignores this part of Gondzur's testimony.

### …*"that the batteries to be stocked in connection with the ACTL Incident weighed up to 50 pounds"*

East Penn argues that Gondzur's opinion is unreliable because he assumed that the batteries at issue weighed "up to 50 pounds," when, in fact, some of the batteries weighed between 35 and 40 pounds. In reality, Gondzur's written report makes clear that he assumed the batteries weighed between 30 and 50 pounds, a range that comfortably includes the weight of the batteries at issue, according to East Penn. (*See* Doc. 24-1, p. 6).

Moreover, as East Penn's memorandum admits, Dorvit delivered "larger, heavier 'Doosan' branded batteries that were kept on the lowest shelf of the same rack at the ACTL Facility." (Doc. 24, p. 15) East Penn's expert assumed that these Doosan batteries weighed "in the 60s," in terms of pounds (Webber Dep. 55:3-6), and according to East Penn's verified answers to interrogatories, the batteries delivery to ACTL "at around the time of Plaintiff's termination" included batteries weighing up to 68 pounds. (East Penn Answer Interr., p. 8, 9] If anything, Gondzur's assumptions <u>under</u>estimate the weight of the batteries.

***… "that the shelves on which the batteries were to be stocked had a sloped-incline of 15-20 degrees" and "that the Plaintiff was forced to load the shelving from front to back, and to hold the batteries from sliding forward against the weight of other older batteries"***

East Penn again misconstrues Gondzur's testimony with regards to the slope of the shelf: "In deposition, Gondzur flatly admits that a reduction of '50 to 60 or so percent less [than the 15% to 20% slope assumed] would have an impact' on the conclusion he reached in his report. (Gondzur, 63-68)" (Doc. 24, p. 16) In fact, when Gondzur was asked what percentage difference in the slope "would be relevant," he responded, "Probably 50 to 60 or so percent less would have an impact. It wouldn't change the hazard completely, but it would probably lessen the hazard." (Gondzur Dep. 65:12-15) And later, he explained, "[S]lope is one component, but it doesn't tell the whole story." (*Id.* 67:18-19, Ex. E) This new "fact,"[7] however, would not change his opinion: the work was still unreasonably hazardous whether the slope was 5% or 15%. (*See id.* 146:10)

***… "that the Plaintiff was, as a result, required to 'get on his hands and knees and load batteries from the front of the rack, in a manner that the rack was not designed to be loaded"***

Dorvit testified that he had to get on hands-and-knees to load the rack, in around 2016. (Doc. 24-3, p. 2; Dorvit Dep. 117:1-118:12) That <u>another</u> East Penn employee—as directed by East Penn's counsel during a site visit to ACTL in January 2022—could maneuver batteries on the *second-from-bottom* by crouching or squatting does not negate the competent evidence in the record that Dorvit believed it necessary to get on his hands-and-knees to load the battery rack at this customer site years earlier.[8]

And as Gondzur testified, even if Dorvit was not on his hands and need, "You're in that same weak posture of a crouch, a squat, or a kneel, and you don't have large muscle groups

---

[7] Counsel for East Penn's calculation of the slope of the shelf is based on his cell phone's measurement, which Gondzur maintains is not a reliable scientific instrument. (*See id.* 83:14-21)

[8] The other East Penn employee, Chris Kines, is not a neutral party: he was directly involved in the "investigation" that led to Dorvit's termination.

available to you to provide you with leverage to move things." (Gondzur Dep. 135:4-22) An awkward posture still was required to remove the batteries because there was not "significant clearance available" above the batteries to "allow you to get a neutral posture with regard to your grip, your wrist, your arm, or shoulder, not to mention are you going to have to turn sideways against that rack." (*Id.* 133:4-10)

Gondzur's expert opinion did not "hinge" on Dorvit being on his hands and knees to load the rack. (*Id.* 114:6-7) As an OSHA instructor, Gondzur trains and coaches ergonomic professionals "to avoid at all cost [ ] the lift[ing] or the lower[ing] [of weighted load] coupled with the twist of the trunk because you're not just creating forces that might shear, but there's rotational force. So it's like a shear in two places at the base of the spine." (*Id.* 136:3-17) The loading of the batteries on the rack at ACTL presented these very risk factors. (*See id.*; 142:2-143:12)

While East Penn's memorandum provides an outline of its cross-examination of Gondzur at trial, it provides no legal basis for excluding his testimony at this stage in the litigation. Expert testimony should not be excluded where the adversarial system can properly be used to challenge the facts the testimony is based upon. *See Syngenta Crop Protection, LLC v. Willowood Azoxystrobin*, LLC, 267 F. Supp. 3d 649, 655 (M.D.N.C. 2017) (noting that "Daubert and Rule 702 are safeguards against unreliable or irrelevant opinions, not guarantees of correctness"), *Precision Fabrics Grp., Inc. v. Tietex Int'l, Ltd.*, 367 F. Supp. 3d 487, 506-07 (D.S.C. 2019) (jury was free to disbelieve expert's testimony, particularly based on defendant's cross-examination of him).

**III.    Gondzur's Specialized Knowledge Is Helpful to the Trier of Fact and Otherwise Satisfies the *Daubert* Test**

Lastly, East Penn argues that Gondzur's opinion suffers a "fatal" flaw because it is not based on "any quantitative analysis." (Doc. 24, p. 18) East Penn's memorandum cites <u>no</u> <u>authority</u> for the proposition that an expert in ergonomics must conduct a quantitative analysis for their opinions to be admissible under *Daubert*. East Penn's position constitutes an unjustifiably narrow a reading of the *Daubert* requirements.

It is well established that qualitative analyses can serve as the basis for reliable expert testimony. For example, in *Lightfoot v. Ga.-Pacific Wood Prods., LLC*, No. 7:16-CV-244-FL, 2018 U.S. LEXUS 160806 (E.D.N.C. Sep. 20, 2018), the court held, "Qualitative assessments and quantitative assessments are both relevant and reliable in accordance with *Daubert*." *Id.* at *39. The question at the core of the gatekeeping function is whether the expert's opinion will assist the trier of fact. *Id.* at *38-39. If a qualitative analysis will assist the trier of fact, there is no arbitrary rule that it must be excluded. *Id.*

Courts have found that measuring safety hazard or risk is reliable where the qualitative analysis of scientific levels of danger that has been, "shown to be hazardous," and which plaintiff has experienced, may be used to establish injury and risk of injury. *Yates v. Ford Motor Co.*, 113 F. 3d 841, 851 (E.D.N.C. 2015). Further, the plaintiff's testimony may be used to illustrate and prove those levels of danger. *See id.* (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 260 (4th Cir. 1999). *See also Driskell v. Summit Contracting Grp., Inc.*, 828 F.App'x 858, 866-67 (4th Cir. 2020) (upholding judgment in NC REDA action based on protected activity under OSHA when the plaintiff complained of the unsafe condition caused by a co-worker's "presence at the [construction] work site while intoxicated," without expert testimony).

In *Yates*, defendants challenged the use of "qualitative evaluations" to address the level of brake dust that the plaintiff encountered and whether it caused pleural mesothelioma. 113 F.3d at 851. The *Yates* court rejected the challenge and held that the use of qualitative evaluations—based on scientifically reliable methods to extrapolate results, even where they were unable to examine the amount of brake dust encountered—was sufficiently reliable to admit the expert's testimony. *Id.*

Similarly, the court in *Westberry* considered the same question and allowed an expert to testify on the use of "qualitative" evaluations to show that certain levels of asbestos were hazardous, and that plaintiff likely encountered those levels based on his testimony. 178 F.3d at at 263-64. The expert at issue proffered a qualitative opinion based on scientifically reliable methods applied to plaintiff's testimony that that his clothes were, "covered in talcum powder each day," a method that satisfied *Daubert*. *See id.*

In this case, Gondzur offers a qualitative opinion based on scientific methods. Gondzur testified that qualitative analyses are accepted in the field of ergonomics; in fact, most of the analysis is qualitative based on prior experience and objective observation of risk factors. (*See* Gondzur Dep. 166:18-23) Further, it is appropriate under *Daubert* to use comparator information and data available in peer-reviewed studies to apply that data to plaintiff's activities. *See Lightfoot*, 2018 U.S. LEXUS 160806 at 39*.

East Penn does not even identify *what* "calculation, analysis or application of the scientific method" (Doc. 24, p. 15) Gondzur should have performed to satisfy their objections. East Penn's own expert offered that there is no bright line, or numerical "lifting limit," issued by OSHA (Webber Dep. 92:16-93:1)—which would, for example, establish that a lift posed an unreasonable risk of physical harm, numerically. As Webber testified, OSHA considers five

factors when evaluating the risk of ergonomic injury: vibration, contact stress, force, awkward posture, and repetition. (*Id.* 33:4-21) These are the same factors that Gondzur evaluated in his report.

The "crux" of Webber's critique of Gondzur's expert opinion is—not that Gondzur incorrectly concluded that Dorvit's work conditions at ACTL presented several risk factors for injury, but rather that the connection between "the presence of a risk factor [ ] to an imminent injury is not necessarily, wasn't necessarily established." (Gondzur Dep. 39:7-10)[9] This goes to the weight of the evidence, not reliability.

East Penn's memorandum does not introduce Webber's report or any of his deposition testimony to challenge Gondzur's methodology. And for good reason: Webber freely admits that Gondzur has "great qualifications" (Webber Dep. 23:19) and "great credentials" (*id.* 24:4). According to East Penn's expert, Gondzur's educational degrees "are solid" (*id.* 24:22-23), and his certification as a certified professional ergonomist (CPE) "prove[s] [he's] competent" in the field of ergonomics. (*Id.* 25:4-5)[10] It is a bridge to far for East Penn to argue that the opinions of a board-certified ergonomist, the "trainer of trainers" on OSHA compliance matters, is "not relevant to any factual issue of the case."

---

[9] When asked whether there was any safe way to load the heaviest batteries on the bottom shelf of the rack at ACTL, Webber responded, "I guess, I need you to define what safe is for me because safe is, is a very loaded term. Does it have risks? It does have risks. It has risk factors present. But does that make it unsafe? Those are two different conversations." (Webber Dep. 63:1-20)

[10] Webber is a self-described "physical therapist" and "not a safety professional" (Webber 23:22, 124:11-17)

For the foregoing reasons, Plaintiff Russell Dorvit respectfully requests that this Court

deny Defendant's Motion to Exclude the Reports and Testimony of Plaintiff's Expert Witness.

This the 22nd day of April, 2022.

/s/ Eric Spengler
Eric Spengler
N.C. State Bar. No. 47165
SPENGLER & AGANS PLLC
352 N. Caswell Road
Charlotte, NC 28204
eric@spengleraganslaw.com
(704) 910-5469 (phone)
(704) 730-7861 (fax)

Joshua R. Van Kampen
N.C. State Bar No. 32168
VAN KAMPEN LAW, P.C.
315 E. Worthington Ave.
Charlotte, NC 28203
josh@vankampenlaw.com
(704) 247-3245 (phone)
(704) 749-2638 (fax)

*Attorneys for Plaintiff*

# INDEX OF EXHIBITS

**Exhibit 1**      Injuries Report (EPM 3596-3604)

**Exhibit 2**      Gondzur Deposition Excerpts

**Exhibit 3**      Webber Deposition Excerpts

**Exhibit 4**      Plaintiff's Second Set of Requests for Documents

**Exhibit 5**      East Penn 30(b)(6) Deposition Excerpts

**Exhibit 6**      Delgarbino Deposition Excerpts

**Exhibit 7**      Hawkins Deposition Excerpts

**Exhibit 8**      Defendant's Answers to Interrogatories

**Exhibit 9**      Dorvit Deposition Excerpts

**Exhibit 10**    Webber Report (December 20, 2021)

## <u>CERTIFICATION OF WORD LIMIT</u>

The undersigned hereby certifies that the foregoing memorandum complies with the word

limits found in LR 7.3(d) in that it does not exceed 6,250 words.


This the 22nd day of April, 2022.                                    /s/ Eric Spengler