| | | |
|---|---|---|
| RUSSELL DORVIT | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **AMENDED COMPLAINT** |
| EAST PENN MANUFACTURING | ) | **(Jury Trial Demanded)** |
| COMPANY, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

NOW COMES Plaintiff Russell Dorvit, complaining and alleging against Defendant East Penn Manufacturing Company, Inc. as follows:

## PARTIES AND JURISDICTION

1. Plaintiff Russell Dorvit ("Dorvit") is an adult resident of Forsyth County, North Carolina.

2. Defendant East Penn Manufacturing Company, Inc. ("East Penn") is a corporation organized under the laws of the state of Pennsylvania. East Penn is in the business of the manufacture and sale of batteries and cables.

3. At all times material to this action, East Penn was an employer to Dorvit, who was an employee of East Penn.

4. On around March 4, 2015, Dorvit began working for East Penn as a straight-truck driver, also known as a "straight-van driver" or a "route-driver van."

5. East Penn terminated Dorvit's employment on May 31, 2019.

6. This action is brought to remedy East Penn's retaliatory termination of Dorvit, in violation of both the Surface Transportation Assistance Act, 49 U.S.C. § 31105 ("STAA"), the

North Carolina Retaliatory Employment Discrimination Act, N.C. Gen. Stat. §§ 95-240 *et seq.* ("NC REDA"), and the common law doctrine of wrongful discharge in violation of public policy ("WDPP").

7.     Pursuant to the STAA, Dorvit filed a complaint with the U.S. Secretary of Labor ("USDOL") on August 23, 2019, that is, not later than 180 days after the termination of his employment.

8.     On or after December 17, 2020, Dorvit received a letter from the Occupational Safety and Health Administration ("OSHA") of the USDOL confirming his right to file a *de novo* action in federal district court.

9.     Pursuant to NC REDA, Dorvit filed a complaint with the North Carolina Department of Labor ("NCDOL") on November 24, 2019, that is, not later than 180 days after the termination of his employment.

10.     On or after December 21, 2020, Dorvit received a right-to-sue letter from the NCDOL.

11.     Dorvit has exhausted all administrative remedies before the USDOL and NCDOL, and this action is timely filed within the period allowed for by law.

12.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367.

13.     Venue is proper in this Court.

## FACTUAL ALLEGATIONS

14.　　East Penn employs more than 10,000 persons at 89 warehouses and distribution locations across the United States and Canada. The company's global headquarters are located in Topton, Pennsylvania.

15.　　East Penn employed Dorvit at its distribution facility located in Winston-Salem, North Carolina.

16.　　At all relevant times, the distribution facility in Winston-Salem, North Carolina was divided into two sides: (a) the distribution center (the "DC" side), also known as Warehouse 60, and (b) the High Point Side Division ("HPSD"), also known as Warehouse 30.

17.　　The DC side featured around 55 tractor-trailer truck drivers. The HPSD was much smaller, with around six (6) straight-truck drivers.

18.　　Dorvit worked as a straight truck driver for East Penn based out of the HPSD. He made deliveries throughout North Carolina, South Carolina, and Virginia.

19.　　Dorvit drove a straight truck, that is, a truck with all axles attached to a single frame. Straight trucks are distinguished from a tractor truck used for drawing trailers.

20.　　The HPSD had three managers based at the Winston Salem distribution facility: Dorvit's direct supervisor, including Zach Christie; Bruce DelGarbino, district manager; and, above him, Frankie Cline, regional manager Southeast.

21.　　DelGarbino also reported to Jeff Black, general manager branch operations, who worked out of East Penn's global headquarters in Pennsylvania.

22.　　DelGarbino and Cline had control over the day-to-day business operations of East Penn at the HPSD.

23.     Upon information and belief, East Penn compensated DelGarbino and Cline, in part, with commissions based on cost savings and/or the profitability of the HPSD.

24.     Around the time Dorvit was hired, DelGarbino expressed concern to Dorvit about his prior work in a union facility for 22 years. DelGarbino warned Dorvit not to attempt to start a union at the HPSD.

25.     In November 2015, Dorvit had an issue with being denied vacation for the week of Thanksgiving, for time off that already had been approved.

26.     Dorvit called corporate human resources (HR) at the East Penn's global headquarters in Pennsylvania.

27.     The HR representative asked Dorvit if he had received a new hire packet, and Dorvit responded that he had not. The new hire packet showed that Dorvit and the other HPSD drivers were entitled to certain employment benefits, of which they were not aware, such as personal days, a free annual rebuilt battery, and health insurance options.

28.     The next day, DelGarbino called Dorvit into his office and instructed him never to call HR again.

29.     On multiple occasions, DelGarbino and Cline reprimanded Dorvit, and attempted to intimidate Dorvit, for contacting human resources and the safety division of the global headquarters in Pennsylvania.

30.     Dorvit and the HPSD drivers received less—in wages, per diem rates, and fringe benefits, such as company-issued cell phones—than their peers in the DC side and other straight truck drivers based in Topton, Pennsylvania.

31.     Upon information and belief, the compensation structure for DelGarbino and Cline gave them an incentive to take cost-cutting measures.

32.     DelGarbino and Cline took cost-cutting measures to an extreme, at times in violation of the law and to the detriment of Dorvit.

33.     DelGarbino once reprimanded Dorvit because he spent $0.25 more than his purported per diem allowance.

34.     DelGarbino and Cline's extreme cost-cutting policies had the effect of forcing Dorvit to stay in "flea bag" motels on overnight trips.

35.     DelGarbino and Cline went so far as to withhold an invitation intended for Dorvit to a "Safe Driver's Award" banquet at the company's global headquarters, upon information and belief, to save the expense of a rental car, hotel room, and related banquet expenses chargeable to the HPSD.

36.     East Penn paid the HPSD straight-truck drivers, including Dorvit, an hourly wage that was significantly less than East Penn's published driver rates for straight-truck trips, based on mileage and battery deliveries.

37.     In late 2015, Dorvit learned that the tractor-trailer drivers on the DC side were paid significantly more than the HPSD drivers.

38.     In 2016, Dorvit first complained to DelGarbino about the discrepancy in his pay, as compared to the HPSD drivers.

39.     A few days later, Dorvit met with Cline to discuss his complaints about wages.

40.     At some later time, Dorvit received a written copy of East Penn's 2017 driver rates from a driver on the DC side of the Winston-Salem facility.

41.     The driver rates document showed that East Penn promised wage rates based primarily on mileage for both tractor-trailer trips and straight-truck trips.

42.     East Penn's deviation from the published driver rates for straight-truck trips resulted in lost wages to Dorvit of approximately $486 to $546 per month, as compared to the hourly rate he received.

43.     East Penn never provided any written wage policies to Dorvit, except for the published driver rates for straight-truck trips.

44.     True and correct copies of the published driver rates for East Penn—as in effect in 2017, 2018, and 2019, respectively—are attached hereto as Exhibit 1.

45.     East Penn never paid Dorvit according to these published driver rates.

46.     During the period from late 2016 through early 2017, Dorvit met with Cline approximately four (4) times to complain about the discrepancy in his wages, including the failure by East Penn to pay him according to the published driver rates for straight-truck trips.

47.     When a fellow HPSD driver, Mike Ellis, attempted to show related calculations of his lost pay around this time, Cline reported Ellis to HR for disciplinary action. Mike Rasool, employee relations manager in Pennsylvania, wrote up Ellis for his wage complaints.

48.     When Dorvit asked why he was not paid according to East Penn's published driver rates, Cline responded in a heated fashion—demanding to know how Dorvit received a copy of the driver rates document.

49.     Dorvit reasonably interpreted Cline's response as an effort to retaliate against the tractor-trailer driver from the DC Side (Warehouse) 60 who provided Dorvit with the driver rate document.

50.     Later discovery would show that Dorvit's complaints to Cline initiated an internal investigation by East Penn's global headquarters into the company's deviation from the driver rates at the HPSD, specifically.

51.     This internal investigation, in late January 2017, involved Cline; Michael Dietrich, fleet operations manager; John Blackburn, vice president sales and branch operations; and, upon information and belief, other high-level executives. Blackburn oversees approximately sixty (60) management-level employees.

52.     In around the late spring or early summer of 2018, Ellis obtained an updated copy of the published driver rates for straight-truck trips.

53.     Soon thereafter, Dorvit met with Cline to renew his complaints about not being paid in accordance with East Penn's written driver rates.

54.     Approximately one week later, Dorvit returned to meet with Cline, again complaining about not receiving the pay specified in the driver rate document.

55.     Cline was non-committal in this second meeting, telling Dorvit that he would talk with Black and get back to Dorvit.

56.     Later discovery would show that Dorvit's renewed complaints to Cline about his disparate pay initiated a <u>second</u> investigation at East Penn's global headquarters into East Penn's wage policies, as related to the HPSD straight-truck drivers.

57.     The scope of the second investigation included not only Cline, Blackburn, and Dietrich, but also Rasool; Alison Snyder, director of human resources; and Bob Harrop, vice president, human resources.

58.     In an email on May 31, 2018, Blackburn wrote, "I'm all for being paying [sic] the same rates for the exact same job." Cline responded, in part, "Maybe we should pay [Dorvit] like all the other branch/sub drivers that drive a ten wheeler?"

59.     The investigation at East Penn's global headquarters into wage and benefits complaints from Dorvit and other straight-truck drivers at the HPSD continued for months.

60. On July 24, 2018, Delgarbino wrote to Rasool, "I have a driver (Russell Dorvit, 29523) who just won't let this go."

61. Rasool forwarded the email to Snyder, who responded, "It appears that we are getting a lot of pressure from the drivers who are part of High Point, connected to Winston Salem that they are compensated and treated differently than both the Winston DC drivers and the Lyons based drivers."

62. In response to Dorvit's repeated complaints, in around late August or early September 2018, Christie called each of the HPSD drivers and told them Black would be at the Winston-Salem facility to talk to the drivers about their pay on September 15, 2018.

63. At around the same time, Black and other executives considered the extent to which Dorvit and the other HPSD drivers had suffered lost wages by East Penn's failure to pay them according to the published driver rates, including by creating a report that calculated the pay discrepancy for the HPSD drivers, specifically, for the month of August 2018.

64. East Penn postponed the meeting with Black several times. Dorvit asked about the meeting on a weekly basis. Christie and DelGarbino eventually told him the meeting was not going to happen.

65. In around early December 2018, Dorvit led a discussion with his fellow HPSD drivers about a planned day of protest: all the HPSD drivers agreed to call in sick on December 10, 2018 in protest of East Penn's cancellation of the meeting with Black and the failure to pay the drivers according to the published driver rates.

66. On around the morning of December 5, 2018, Christie learned of the drivers' plans to call out from work. By that afternoon, Dorvit and the other HPSD drivers were told a conference call with Black and Snyder would be held at 10:30 am the next day.

67. On the call the next day, Dorvit began by asking Black why the HPSD drivers were not paid the same as the rest of the companies' drivers. Black responded that he did not know why the HPSD drivers were paid differently and pledged to report back in a month.

68. Dorvit also complained on the conference call with Black about fringe benefits, including how each of the HPSD drivers used his personal cell phone because no company phones were offered to them.

69. DelGarbino responded by falsely claiming the HPSD drivers had been offered and declined business cell phones. Each of the drivers refuted that claim to Black.

70. All or substantially all of the drivers in the DC side had company-issued smartphones for some time.

71. As Dorvit went to leave the meeting, DelGarbino told him, "Just so you know, you're getting a God damn flip phone." DelGarbino bemoaned to Dorvit that he had just cost DelGarbino $30 per driver per month.

72. The follow-up call with Black—for East Penn's response to Dorvit's demand for wages—was scheduled, rescheduled, and cancelled. Dorvit and the other HPSD drivers did not hear back from East Penn's upper corporate management in January 2019 or February 2019.

73. Then, in March 2019, Black held the follow-up conference call with Dorvit and the HPSD drivers.

74. Black told Dorvit and his fellow straight-truck drivers at HPSD that they were "warehouse workers," not truck drivers, and so that is why they were paid hourly, and not according to the published driver rates.

75.     Black informed Dorvit and the HPSD drivers that East Penn would pay a $1.15 per hour raise and nothing else, denying Dorvit and the HPSD drivers the company's published driver rates.

76.     Dorvit asked Black if East Penn would make backpay to September 2018 when the first meeting was to occur. Black laughed and declined.

77.     Dorvit was surprised that East Penn refused to treat him and the other HPSD straight-truck drivers like drivers, subject to the company's published driver rates.

78.     About one week after the March 2019 meeting, Christie asked Dorvit if he was going to drop his pursuit to be paid based on mileage according to East Penn's published driver rates.

79.     Dorvit told Christie that he would not let his complaints go and that he continued to believe he was lawfully entitled to be paid according to East Penn's published driver rates.

## DORVIT REFUSES TO DRIVE OFF THE CLOCK

80.     In around January 2018, East Penn transitioned the HPSD drivers from paper to electronic drive time logs.

81.     Around the same time, Dorvit began talking to Christie and DelGarbino on-and-off about how East Penn could not assign the straight-truck drivers so many stops and not violate U.S. Department of Transportation ("DOT") regulations on maximum drive time hours.

82.     Unlike the paper logs, the electronic logs precisely tracked drive time and could not be manipulated, as East Penn had instructed the HPSD drivers to do with paper records.

83.     Dorvit knew that he could lose his commercial driver's license and be fined if he was caught driving in excess of the maximum driving time allowed by federal law.

84.     DelGarbino and Cline, through Christie, ordered Dorvit and the other HPSD straight van drivers to drive off-the-clock in excess of maximum hours, and in violation of federal law, for the purpose of saving on motel expenses.

85.     In the spring of 2019, East Penn began conducting monthly safety meetings, with Christie leading the meetings.

86.     In around March 2019, Dorvit learned that one of the HPSD drivers was using another driver's ID in the electronic drivetime log when the driver had exhausted his own hours. Other times, this driver would turn off the drive logs and drive back to the warehouse, also in excess of the maximum hours.

87.     In around early April 2019, Christie led a safety meeting with all the HPSD drivers. Christie instructed the HPSD drivers that if they were to run out of drive time—and were within one (1) hour of the warehouse—they should turn off their electronic logs and drive back under the radar.

88.     East Penn specifically instructed the HPSD drivers to keep driving to the warehouse if they reached the maximum drive time and were within one (1) hour of the warehouse.

89.     Christie told the drivers they were no longer allowed to stop for the night at a motel to avoid driving in excess of the maximum hours.

90.     Dorvit spoke up and said that what Christie instructed the drivers to do was illegal, that it was the drivers' commercial licenses on the line, and that Christie could not instruct the drivers to do anything that was illegal.

91.     Christie responded that this was new company policy, and Dorvit was required to comply. Christie attempted to justify the illegality of the instruction by noting the lack of severe penalties under East Penn's employment policies.

92.     According to Christie, East Penn's policies allowed each of the drivers an allowance of three (3) DOT write ups per six (6) months without consequence.

93.     A true and correct copy of East Penn's Driver Code of Conduct, as in effect during Dorvit's employment, is attached hereto as Exhibit 2.

94.     Dorvit argued with Christie and DelGarbino that this direction was just not right.

95.     The same day as the safety meeting with Christie, Dorvit called Snyder and asked for copies of all East Penn's policies and procedures that applied to him. Snyder was unhappy with Dorvit's call and responded that she did not have to give him the requested documents.

96.     Dorvit replied that Snyder was on the conference call the previous month where Black called him a "warehouse worker." Dorvit told Snyder he wanted a copy of documents that provided for his job title, job description, and required company policies.

97.     On April 12, 2019, Snyder mailed the requested documents to Dorvit's home address. The job description showed that Dorvit was a straight van driver, just like what is listed on the driver rate sheets (see Exhibit 1). The other documents did not match Christie's instructions at the safety meeting.

98.     Emboldened by the written policies, Dorvit went to see Christie in his office. Dorvit showed Christie that East Penn did not have a policy that allowed for driving without drive time, or in excess of maximum hours.

99.     Christie responded that he did not know what the big deal was with Dorvit.

100. Dorvit told Christie that he wanted something in writing, signed by Christie, if he was to continue instructing Dorvit to drive with disabled electronic drive time logs, or in excess of the maximum drive time.

101. Dorvit returned to Christie's office a few days later to ask again for the policy in writing. Christie attempted to reverse course and claim that he never had instructed Dorvit and the other HPSD drivers to drive without drive time. Christie said such a policy would be illegal and that he would not put any such policy in writing.

102. East Penn later engaged further in a cover up of the illegal instruction regarding electronic drive time logs and maximum drive time hours.

103. Soon after East Penn received notice of Dorvit's administrative charge with OSHA, as filed on August 23, 2019, Delgarbino summoned HPSD driver Joey Wells into his office. Delgarbino asked Wells he had ever been instructed to turn off or disable the electronic logs, or asked to drive without drive time.

104. Wells told Delgarbino that, yes, he had been asked to drive without drive time.

105. Delgarbino asked Wells who instructed Wells to drive without drive time. Wells responded by identifying Zach Christie.

106. Later, in early November 2019, Delgarbino called the HPSD drivers into his office and gave them a prepared declaration (or affidavit).

107. The document was a declaration in which each straight-truck driver, including Wells, was to swear or aver that East Penn had never asked them to drive without drive time.

108. Without any explanation, Delgarbino told the drivers they needed to sign the paper.

109.     By presenting the document to Wells for his signature, Delgarbino was knowingly suborning perjury from one of his subordinate employees.

110.     In Delgarbino's office, Wells highlighted with a pen those areas of the letter which directly contradicted what he had told Delgarbino earlier. Wells stood up to his boss and told Delgarbino he could not sign the document because he, in fact, had been directed to drive without drive time by Christie.

111.     Upon information and belief, others of the straight-truck drivers signed the document, knowing their statements to be false, but out of fear of retaliation by East Penn if they refused.

112.     Upon information and belief, Delgarbino intentionally destroyed the document returned by Wells with the highlights, resulting in the spoilation of evidence.

EAST PENN REPRIMANDS DORVIT FOR RAISING SAFETY CONCERNS

113.     In January 2019, Dorvit struggled physically to retrieve "junk" batteries from a UPS facility in a safe manner.

114.     The spent batteries were stored on a rack in a small tool room at the UPS facility, and the only way for Dorvit to remove the batteries was to pull them out on his hands and knees, while in a small space. The maneuver was awkward and difficult for Dorvit.

115.     The tight space prevented Dorvit from being able to use proper equipment, such as a hand cart, to move the batteries, and Dorvit was concerned about the risk of injury of twisting and pushing/pulling on his hands and knees.

116.     Dorvit first spoke to Christie about his workplace safety concerns regarding the UPS facility, and Christie did not offer any solutions.

117.     Dorvit then called East Penn's HR at the company headquarters in Pennsylvania and asked to speak to the safety department.

118.     The woman who took Dorvit's call said she was unable to connect him to anyone in the safety department and instead transferred his call to Black. Dorvit left Black a message about the safety issue at the UPS site.

119.     The next day, Dorvit was called into a meeting with Christie and DelGarbino, with Rasool participating by phone.

120.     Rasool told Dorvit that he had no business whatsoever calling East Penn's safety department and that Dorvit could be written up for attempting to call the safety department.

121.     Dorvit explained that he did nothing wrong: that he had spoken first with his direct supervisor about the issue and, because nothing was done, he elevated his complaint.

122.     Rasool asked DelGarbino to take care of Dorvit's safety complaint and ended the call, instructing Dorvit to never call the safety department again.

123.     DelGarbino told Dorvit later that day that his complaints about the UPS facility were not a safety issue. DelGarbino said that if Dorvit had to climb up a 20-foot ladder with a 100-pound battery, that would be a safety issue—but this was not.

## EAST PENN TERMINATES DORVIT FOR PRETEXTUAL REASONS

124.     On May 22, 2019, Dorvit dropped several batteries to Atlantic Coast Toyota Lift ("ACTL").

125.     Dorvit had serviced ACTL, without incident, since November 2015.

126.     ACTL stored batteries on a rack with slanted shelves, similar to how milk is shelved in grocery stores.

127.     East Penn had a "first in first out" ("FIFO") policy for stocking battery racks, meaning the oldest batteries were to be displayed at the front of the rack, with newer batteries at the rear of the rack.

128.     ACTL's rack was designed, per manufacturer's specifications, to be loaded from the rear.

129.     ACTL's facility was disorganized, and the company's battery rack was positioned with the rear of the rack against a wall.

130.     ACTL stored batteries on the bottom shelf of the rack, just above floor level.

131.     When Dorvit first started delivering to ACTL, he would get down on his hands and knees on the floor, pull out all the old batteries, and push the newly delivered batteries to the back of the rack, and then load the old batteries back in last, against the weight of all the other batteries.

132.     Loading the rack in this way was a safety hazard and increased the risk of occupational injury to Dorvit, in violation of East Penn's policies.

133.     East Penn's policies for reducing occupational injuries maintain that "body posture is critical" and warns that "lifting and twisting to move product may get backs and knees outside the normal range of motion." A true and correct copy of an East Penn policy for reducing workplace injuries is attached hereto as Exhibit 3.

134.     East Penn's code of conduct further required Dorvit to "use equipment properly and as designed."

135.     East Penn required, "[a]s a condition of employment," that Dorvit be "responsible for performing his or her job safely and for minimizing the risk of injury to" himself and others.

136. East Penn further required that Dorvit to "[a]lways promptly report unsafe conditions and acts to [his] supervisor" and "[u]se equipment properly and as designed."

137. A true and correct copy of East Penn's Company Code of Conduct, including the company's policy for equipment use, is attached hereto as Exhibit 4.

138. At the time of his termination, Dorvit was fifty-two (52) years old and had a history of a bad elbow and knee. Dorvit had elbow surgery in 2011 or 2012 and arthroscopic knee surgery in 2013. Dorvit disclosed his full medical condition, including his prior surgeries, in his employment application materials to East Penn.

139. In recognition of the safety hazards posed by improperly loading the battery rack on his hands and knees, Dorvit asked the customer representative at ACTL, in late 2015 or early 2016, if ACTL could move the rack out a few feet for proper loading.

140. The customer representative responded that he did not know why Dorvit was even stocking the rack because all other drivers left the battery deliveries on the floor for ACTL's stock person to put the batteries on the rack, and this arrangement was acceptable to ACTL.

141. For years, Dorvit left batteries on the floor at ACTL, without incident, until May 22, 2019. Josh Hawkins, another HPSD driver, also followed the practice of leaving batteries on the floor at ACTL.

142. On May 22, 2019, Dorvit left the batteries on the floor at ACTL and retrieved ACTL's "junk" batteries for return delivery to East Penn.

143. Dorvit waited for ACTL's manager to get off the phone, and the manager signed for the batteries that day.

144. Shortly after leaving ACTL, Dorvit received a text message from Christie asking that he load the batteries on the rack at ACTL.

145.     Dorvit explained to Christie that the rack was against a wall and that he had left the batteries on the floor for years.

146.     Christie directed Dorvit, going forward, to get on his hands and knees and load the batteries from the front of the rack, in a manner that the rack was not designed to be loaded.

147.     Dorvit told Christie that loading the rack in that manner was an unsafe practice and could lead to workplace injury. Dorvit said he was not paid enough money to crawl on his hands and knees to put batteries on the rack in an unsafe manner.

148.     Dorvit satisfied his responsibilities under East Penn's company policies, and exercised his rights to a safe workplace under North Carolina law, by reporting safety issues with the battery racks at the UPS and ACTL facilities.

149.     Dorvit worked the next two business days without incident, after the text exchange with Christie.

150.     On May 29, 2019, Delgarbino told Dorvit he needed to join a call with Christie and Snyder.

151.     On the call, Snyder questioned Dorvit why he had not loaded the batteries on the rack at ACTL on May 22. Dorvit told Snyder the same things he told Christie.

152.     Snyder told Dorvit he was suspended pending an investigation into his "insubordination."

153.     Without any further discussion, on May 31, 2019, Snyder informed Dorvit he was terminated for insubordination.

154.     Dorvit was incredulous that East Penn could terminate his employment for how he delivered batteries to one customer out of hundreds. Snyder responded by admitting there may have been a "few other things" he was getting fired for.

155. Snyder told Dorvit his health insurance was terminated effective immediately, said goodbye, and hung up the phone.

156. Later discovery would reveal that, the day before East Penn terminated Dorvit, Zach Christie sent a message to Alison, copying Delgarbino and Cline, in which he acknowledged that Dorvit had complained that placing the batteries by hand on the rack, in violation of the equipment design, was a workplace "safety issue."

157. East Penn terminated Dorvit's employment after he voiced complaints about workplace safety.

158. In recommending Dorvit's termination, in an internal email, Christie claimed that Dorvit's "attitude, disrespect, and insubordinate behavior, towards myself and [Delgarbino], has been ongoing for some time."

159. This statement from Christie constitutes *de facto* admission by East Penn that Dorvit's legally protected activity—that is, his repeated complaints about unpaid wages, reports of workplace safety issues, and refusal to follow instructions by his supervisors to drive "off-the-clock"—were substantial, motivating factors in East Penn's decision to terminate Dorvit.

160. East Penn considered Dorvit to be the ringleader, that is, the most vocal of the HPSD drivers in protest of East Penn's illegal and unsafe policies.

161. Throughout Dorvit's employment, East Penn treated serious misconduct of other employees—including the destruction of company property and bringing firearms to work—with leniency.

162. After Dorvit's termination, ACTL moved the rack away from the wall, so that it could be loaded properly from the back by the East Penn delivery driver who replaced Dorvit on this delivery route.

163. This move of the battery rack was achieved with minimum to no disruption to East Penn's business operations.

164. Dorvit had no discipline history in his four years with East Penn, prior to his termination.

165. Dorvit had hundreds of customers to whom he delivered batteries over his four years with East Penn, and none complained about him before the ACTL incident. Dorvit was well liked by the East Penn customers he served.

166. Dorvit passed every DOT inspection and won every award offered by East Penn to drivers.

167. The conduct that Dorvit is alleged to have engaged in by East Penn, by the company's own written policies, is not grounds for immediate termination, according to the company's written policies.

168. Dorvit never stole property of the company, customers, or employees.

169. Dorvit never engaged in the unauthorized use of equipment.

170. Dorvit never willfully damaged equipment or engaged in gross neglect resulting in damage to equipment.

171. Dorvit never carried passengers without authorization.

172. Dorvit never refused to drive without just cause.

## FIRST CAUSE OF ACTION
## SURFACE TRANSPORTATION ASSISTANCE ACT
### (49 U.S.C. § 31105)

173.     All other paragraphs are incorporated herein by reference.

174.     East Penn discharged Dorvit and otherwise discriminated against him because (a) Dorvit refused to operate East Penn's straight truck in violation of a regulation, standard, or order of the United States related to commercial motor vehicle safety, health, or security, and/or (b) East Penn perceived that Dorvit was about to file a complaint or had begun or was about to begin a proceeding related to a violation of a commercial motor vehicle safety or security regulation, standard, or order.

175.     East Penn's decision to terminate Dorvit's employment was motived by a desire to retaliate against Dorvit for making safety complaints and engaging in activity protected under the STAA.

176.     East Penn's articulated reason for his termination was pretext for unlawful retaliation.

177.     In the alternative, East Penn unlawfully terminated Dorvit's employment with mixed motives, including a desire to retaliate against Dorvit for making safety complaints and engaging in activity protected under the STAA.

178.     Dorvit has suffered damages as a result of East Penn's unlawful termination and retaliation under the STAA.

## SECOND CAUSE OF ACTION
## N.C. RETALIATORY EMPLOYMENT DISCRIMINATION ACT
### (N.C. GEN. STAT. § 95-241)

179.     All other paragraphs are incorporated herein by reference.

180. The North Carolina Retaliatory Employment Discrimination Act, N.C. GEN. STAT. § 95-241 ("REDA") prohibits employers from taking retaliatory action against an employee if the employee "in good faith does or threatens to" "[f]ile a claim or complaint, initiate any inquiry, investigation, inspection, proceeding or other action, or testify or provide information to any person with respect to," *inter alia*, the N.C. Wage and Hour Act, N.C. GEN. STAT. §§ 95-25.1 *et seq.* ("NCWHA") and/or or the N.C. Occupational Safety and Health Act, N.C. GEN. STAT. §§ 95-16 *et seq.* ("NC OSH Act").

181. REDA further prohibits employers from taking retaliatory action against an employee who "in good faith does or threatens to" exercise "any right on behalf of the employee or any other employee afforded by" the NCWHA and/or the NC OSH Act.

182. Retaliatory action includes, but is not limited to, discharge, demotion, retaliatory relocation of an employee, or other adverse employment action taken against an employee in the terms, conditions, privileges, and benefits of employment.

183. Dorvit reasonably, and in good faith, believed that the failure of East Penn to pay him in accordance with the promise of the company's written wage policies, as found in the company's published driver rates, violated the NCWHA.

184. Dorvit complained about East Penn's failure to pay him in accordance with the company's written wage policies, as found in the company's published driver rates, to high-level executives of East Penn.

185. Dorvit's complaints initiated an inquiry and/or investigation into East Penn's wage policies by the same high-level executives.

186.     Dorvit reasonably, and in good faith, believed that East Penn's direction to unload and deliver batteries on the racks at the UPS and ACTL facilities violated his rights to a safe workplace, as afforded under the NC OSH Act.

187.     Dorvit attempted to complain and complained about the unsafe working conditions he experienced while an employee of East Penn to his immediate supervisors and the safety department and human resources departments.

188.     Dorvit exercised his rights under the NC OSH Act by refusing his employer's instructions (a) to unload and deliver batteries in an unsafe manner that risked serious bodily injury to Dorvit, including without limitation injuries that could require a second surgery to his elbow or knee, and (b) to operate his straight truck in an unsafe manner that risked serious bodily injury and/or death to Dorvit.

189.     Dorvit's legally protected activity under REDA was a substantial factor in East Penn's decision to terminate his employment.

190.     Upon information and belief, East Penn reasonably believed that Dorvit would file formal complaints related to wages and/or safety issues, and this was another substantial factor in East Penn's decision to terminate his employment.

191.     As a proximate result of East Penn's conduct, Dorvit has suffered damages, including but not limited to lost wages, emotional distress, and other compensatory damages.

192.     East Penn's conduct breached not only the law of the state of North Carolina, but also their own internal policies by terminating Dorvit in retaliation for reporting, in good faith, a violation of East Penn's own policies.

193.     East Penn's actions were done in bad faith and in a manner that demonstrates an unreasonable and reckless disregard for Dorvit's rights such that treble damages are appropriate.

## THIRD CAUSE OF ACTION
## WRONGFUL DISCHARGE IN VIOLATION OF
## NORTH CAROLINA PUBLIC POLICY

194.     All other allegations in the Complaint are incorporated herein by reference.

195.     The allegations contained in the foregoing paragraphs are incorporated by reference herein.

196.      The public policy of the State of North Carolina, as set forth in REDA, prohibits employers from taking retaliatory action against an employee who reports and opposes wage and hour violations under the NCWHA, who reports and opposes workplace safety violations under NC OSH Act, and who reports and opposes motor carrier safety violations under N.C. Gen. Stat. § 20-381 or 14B N.C. Admin Code 7C.0101.

197.     East Penn violated these public policies by terminating Dorvit for engaging in protected activity under the aforementioned statutes. Such unlawful employer conduct has a tendency to be injurious to the public policy of North Carolina and against the public good.

198.     As a proximate result of East Penn's wrongful conduct, Dorvit has suffered damages, including but not limited to lost wages, emotional distress, and other compensatory damages.

199.     East Penn's actions were done maliciously, willfully or wantonly and in a manner that demonstrates a reckless disregard for Dorvit's rights.

200.     East Penn's officers, managers, and directors participated in and condoned the conduct described above. As a result, Plaintiff is entitled to recover punitive damages from East Penn pursuant to N.C. Gen. Stat. § 1D-15.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Russell Dorvit prays the Court to enter a judgment against Defendant East Penn Manufacturing Company, Inc. awarding Dorvit:

1.   compensatory damages under all causes of action;

2.   punitive damages under the First Cause of Action, pursuant to 49 U.S.C. § 31105;

3.   treble damages under the Second Cause of Action, pursuant to N.C. GEN. STAT. § 7A-243);

4.   punitive damages under the Third Cause of Action, pursuant to N.C. Gen. Stat. § 1D-15;

5.   reasonable attorney's fees, including as provided for under 49 U.S.C. § 31105 and N.C. GEN. STAT. § 7A-243; and

6.   prejudgment and post-judgment interest as allowed by law.

Dorvit further prays for a trial of this matter by a jury and such other and further equitable relief as the Court deems just and proper.

Respectfully submitted,

This, the 22nd day of March, 2020.

/s/ Eric Spengler
Eric Spengler
N.C. State Bar. No. 47165
SPENGLER & AGANS PLLC
352 N. Caswell Road
Charlotte, NC 28204
eric@spengleraganslaw.com
(704) 910-5469 (phone)
(704) 730-7861 (fax)

Joshua R. Van Kampen
N.C. State Bar No. 32168
VAN KAMPEN LAW, P.C.
315 E. Worthington Ave.
Charlotte, NC 28203
josh@vankampenlaw.com
(704) 247-3245 (phone)
(704) 749-2638 (fax)

*Attorneys for Plaintiff*